ATTORNEY GENERAL *vs.* HENRY M. WHITNEY.

Suffolk.    March 26, 27. — July 23, 1884.

In 1852, the Commonwealth of Massachusetts, a certain corporation, and others, were the owners of a large tract of flats in the city of Boston. In that year, a resolve of the Legislature provided for the appointment of commissioners, by whom the relative rights of the parties interested in the flats were to be settled, and a plan adopted for the filling and improvement of the same, "securing perfect drainage and spacious streets, squares, and ponds, if deemed expedient for public use and ornament," and all persons owning said flats were to "fill up and improve them according to said plan, and not otherwise." In 1854, by an indenture between the parties, the commissioners were to furnish, within two years, a plan of the corporation's lands, and the corporation agreed to lay out its lands in conformity with such plan, as to the "location and arrangement of streets, squares, and other public areas." In 1864, an indenture was executed between the same parties in triplicate, which provided that a new plan signed by the parties should be adopted in lieu of the former plan, and that "all streets or ways" should be according to the new plan. With each copy of the indenture was a plan printed from a lithographic stone. These plans represented in a certain locality, owned by the corporation, two streets crossing each other at an acute angle. Near the point of intersection was a large triangular piece of land, not surrounded by lines on the plan. Before the indenture was executed, this triangle was on two of the plans surrounded by lines and colored green, and on the other plan no change was made. The triangle did not appear at all on the plan of 1854. *Held,* on an information in equity by the Attorney General, to prevent any building being placed on this triangle, that the land in question was not, by the indenture of 1864 and the plan, a part of the streets, or reserved for a public area, or dedicated to the public use. *Held, also,* that, whatever were the previous contracts or agreements of the parties on this subject, they were merged in the indenture and plan. *Held, also,* that evidence that, after the indenture was executed, the officers of the corporation treated the land in question as if it were to be kept open, did not enumerate it in a schedule of its property, and sold lots by plans on which this appeared as an open space, and that the city filled up the land at its own expense, and for many years did not tax it, was insufficient to prove a dedication of it to the public; and that the indenture was not to be construed in the light of such facts.

DEVENS, J.    This is an information in equity, filed by the Attorney General, at the relation of the Harbor and Land Commissioners, to restrain the defendant from building on a triangular piece of land in the city of Boston, containing about five thousand square feet, situated west of Trinity Church and north of the Museum of Fine Arts, and bounded by Huntington Avenue, St. James Avenue, and Trinity Place.    Huntington Avenue crosses St. James Avenue at an acute angle, and the land in question is near their point of intersection.    It is the

same piece of land over which it was attempted to assert an easement in *Boston Water Power Co.* v. *Boston,* 127 Mass. 374, and in *Williams* v. *Boston Water Power Co.* 134 Mass. 406.

In 1852, the Commonwealth, the Boston Water Power Company, and certain other parties, owned the flats southerly of the Mill Dam, in the region now known as the Back Bay; and a comprehensive scheme was entered upon for the improvement of this territory. From time to time, the arrangements between the parties interested and the plans for the improvement of the territory were modified, until the negotiations between the parties resulted in an indenture, dated December 31, 1864, and a substituted plan or plans connected therewith, so far as they affected the land in question. None of the plans before those of December 31, 1864, showed the triangle in controversy, and the indenture of that date, in connection with the accompanying plans, forms the basis of this information, which alleges that the Boston Water Power Company thereby, "and otherwise by its treatment and management of the lot" in question, "and by other its acts and deeds, dedicated said lot of land to the public for public uses as a public street or other public area," and that the said dedication was accepted by the Commonwealth and by the city of Boston. The parties to this indenture were the Commonwealth by its commissioners, the Boston Water Power Company, and the city of Boston. The preamble recites, that whereas by an indenture of December 11, 1856, provision is made for the building of certain sewers, and it is deemed expedient that they shall not be built, but other means of drainage shall be provided, "and whereas by the said indenture certain provisions were made in regard to the laying out and making of streets or ways on the Back Bay territory, so called, lying in the westerly part of the city of Boston, which it is deemed expedient to change in some respects," the agreement is therefore made.

It is the contention of the relators, that the Boston Water Power Company, the defendant's grantor, covenanted in this tripartite indenture of December 31, 1864, with the Commonwealth, that the triangle should be kept open for public use, and that the defendant had knowledge of this covenant and is bound by it; and further, that the triangle was dedicated to

public use by the Boston Water Power Company, and that such dedication was accepted by the Commonwealth and the city of Boston. As this contention rests mainly upon the character of the plans, one of which accompanied each original indenture, it is somewhat extraordinary that these plans should exhibit the locus differently, if any importance was attached to them in this respect. On the plan accompanying the indenture held by the city there is no enclosure of the locus, while on the other two plans it is enclosed with lines, and colored green. Had the locus been shown on all the plans as upon that which came into the possession of the city, the relators contend that there would be no room for dispute, and that the words of the indenture, that "all streets . . . . shall be according to the plan," would make it a part of the public street, as it would be indistinguishable from what would then appear as the wrought or travelled portion thereof.

This is virtually the same argument which was addressed to us in *Williams* v. *Boston Water Power Company, ubi supra.* The plan there referred to showed the street lines on the opposite side from the triangle in question, but did not enclose it by inner lines, and on this fact the plaintiff founded his claim that it should remain open. But it was there said, in substance, that the lines on the opposite side of the ways enclosing the triangle could not be taken to mean that all within them should be open. They were the side lines of streets, and extended in the same directions as far as the streets were shown on the plan. In that case, as there were no inner street lines enclosing the triangle, there was nothing except the equal width of the streets elsewhere to show where these lines were to be drawn. In the plan we are considering, the width of the streets which bound this triangle is given. Even if their inner side lines are not protracted so as definitely to enclose the triangle, it is not to be inferred that the land which lies outside of such lines when protracted is surrendered to the public, nor does the plan thus show it to be a part of the street. If there is any difference, however, in the effect to be given to these plans, it is to be observed that those which are annexed to the instruments retained by the Boston Water Power Company, under which the defendant claims, and by the Commonwealth, exhibit this triangle as a space enclosed by the inner side lines

of the streets which form it. That these plans were those by which the parties intended to be governed is shown by the evidence, as stated in the argument for the relators, which we quote and adopt: " It appears from the evidence that the plans when printed from the stone showed no triangle at all; they were all just like the one at the City Hall. But it further appears that on two of these plans lines were drawn in ink surrounding the triangle, which was then colored green. This was done before the execution of the indenture and plan. The triangle was subsequently placed on the stone."

When a plan connected with an indenture, which refers to it only for the streets and ways delineated thereon, distinctly shows a piece of land not included in the limits of those ways, but, as thus situated, excluded therefrom by their inner side lines, the strongest evidence is afforded that it does not form a portion of the street. Nor is this evidence controlled by the fact that the tract is colored green, when it is thus excluded from within the street lines. Were the width of a street given, and its side lines drawn so as to include strips colored green, as was the plan of Huntington Avenue, an intention that they should not be wrought or travelled upon might be thus indicated, although they would not be less a part of the street, having been included within its lines.

If, however, the plan cannot be construed to mean that this triangle is a part of the public street, the relators contend that it must mean that it was reserved for public uses as a " square, park, or other public area," not to be built upon; and that a covenant that it should be thus used is to be implied against the Boston Water Power Company, or that it is to be held to have been thus dedicated by the company.

The Resolve of 1852, *c.* 79, provided for the appointment of three commissioners, by whom the relative rights of the parties interested in the Back Bay territory were to be settled, and a plan to be adopted for the filling and improvement of the same, " securing perfect drainage and spacious streets, squares, and ponds, if deemed expedient for public use and ornament." It further provided, that all persons owning lands should " fill up and improve the same according to said plan, and not otherwise."

On June 9, 1854, an indenture was executed between the three parties, by which, in article 5, it was provided that, in the plans to be devised by the commissioners, not more than one third part of the land or flats of either of said parties which were included in said plans should be required "for streets or other public use;" and by the same article it is agreed that the commissioners "will, within ninety days after the approval of this indenture by the Governor and Council, furnish so much of their plan as shall be applicable to that part of the lands of said corporation situated in the empty basin, and lying south of the Boston and Providence Railroad, and east of the junction or crossing of said railroad and of the Boston and Worcester Railroad, and the portion of their plan applicable to the remainder of said corporation's lands in said basin within two years after the said approval." By article 6 of the same indenture, the Boston Water Power Company agrees to "fill up, lay out, and drain its lands, conformably to such directions and plans, as to materials and height of filling, mode of drainage, location and arrangement of streets, squares, and other public areas, . . . . as may, under the said Resolves, and according to the provisions of this indenture, be prescribed by said commissioners or their successors, and duly made known to the parties." The plan which includes that portion of the territory containing the locus was furnished within two years from the date of the acceptance of the indenture. It did not exhibit the triangle in controversy, and, when the indenture of December 31, 1864, was made, the right of the Commonwealth to take lands for streets, squares, and public areas had expired by limitation of time, so far as it existed under the earlier indenture.

No mention is made of squares or other public areas in the later indenture of December 31, 1864, nor is there any reference to the accompanying plan for a description of such squares or areas. The plans which accompanied this indenture are referred to therein for four purposes only, and to this extent they are incorporated in it. Three of these references cannot be of importance to the matter we are considering. Article 4 refers to it for the lines of all sewers which are marked on it; article 6, for the site of the Institute for Fine Arts; article 7, for the designation of certain reserved lots which the city was entitled to

purchase, at its option, for a price agreed. Article 5 is an agreement between the Commonwealth and the Boston Water Power Company, assented to by the city of Boston, that the plan now considered, "signed by the three several parties hereto, showing the contemplated streets on the said territory, shall be adopted in lieu of the plan which was heretofore agreed upon by the said parties or any of them, and that all streets or ways which shall be made on so much of the said territory as belongs to the said parties of the first and second parts [the Boston Water Power Company and the city of Boston] shall be according to the said plan adopted by this instrument, provided that nothing in this new plan shall interfere with the plan of lands belonging to the Commonwealth, and adopted by the commissioners on public lands, except as hereinafter provided, and except so far as is necessary to connect Huntington Avenue with Boylston Street."

There is no suggestion in the indenture that the plan is referred to as exhibiting any squares, parks, or public areas. The purposes for which it is referred to are defined, and unless these specified objects are necessarily dependent upon, or to be construed with, other portions of the plan, such portions are not brought within the scope of the agreement. *Boston Water Power Co.* v. *Boston, ubi supra. Light* v. *Goddard,* 11 Allen, 5. The indenture had no relation to the subject of squares or public areas, the time for taking or setting aside which had long expired. It was intended thereby to provide for the construction of two important sewers, not previously contemplated, and a rearrangement, which was thus rendered necessary in some particulars, of the streets and ways, so that they might be accommodated thereto. Had this parcel distinctly appeared as a square or park, we are not prepared to say, having regard to the limited purposes for which the plan was referred to, that its appearance could be construed as covenanting that it should be a park, or as dedicating it as such. But we are not disposed to rest our decision simply on this ground. Even if, in view of all the facts appearing as a part of the history of this important scheme for the improvement of valuable lands, we were ready to hold that, if a tract of land were shown on this plan as appropriated to public use, the parties to the indenture

would be as effectually bound that it should be so appropriated as if it were thus expressly agreed in terms, it is not thus exhibited.

It is said by Mr. Justice Ames, in *Boston Water Power Co.* v. *Boston, ubi supra,* speaking of this triangle, "The mode in which it is exhibited on the plan, although it may have possibly been an indication of an intent to leave it open, or not covered with buildings, was far from being an unequivocal dedication of it as a way for the use of the purchasers, or a surrender of control over it." By Mr. Justice Holmes, in *Williams* v. *Boston Water Power Co. ubi supra,* it is said, "While it is undoubtedly true that the plan did not show any affirmative intention to enclose or build upon the triangle in question, we think that it is also true that the plan failed to assert a contrary intention so as definitely to give Matthews [the plaintiff's grantor] an easement." The plans in both these cases exhibited the open triangular space as it is exhibited in the plan annexed to the copy of the indenture held by the city of Boston. Enclosing the triangle and coloring it green cannot be treated as a dedication of it to public use, or an agreement that it shall not be built upon.

Nor does the evidence produced by the plaintiff satisfy us that when a tract, without the limits of a street, is colored green by its owner on any map or plan, he is thereby deemed by those familiar with transactions in real estate to have set it aside for public purposes. Whether, if it were proved that such were the universal understanding, such a mode of conveyance could be sanctioned, is not now the question. That this color is frequently employed to indicate spaces not intended to be built upon is shown, as it is that other colors are similarly used according to the fancy of draughtsmen and designers, as appears by the book of plans in the case at bar; but that a contract can be founded on this practice, which shall operate to deprive a party of the ordinary beneficial uses of his land, is not a tenable proposition. If intended for a park or public area, this triangle would have been marked as such, and the absence of such distinct notice affords the strongest evidence that the owner did not intend to relinquish his control over it, or dedicate it to the public use. We certainly cannot hold that, by employing this

color, the Boston Water Power Company has shown affirmatively an intention not to build upon the land.

We are not disposed to abandon the use of language, or to aid in introducing a new method of conveyancing by colors or pictorial representation independently of it, under a system of legislation which requires all estates or interests in lands, more important than those which are to have the force and effect of those at will only, to be conveyed by instruments in writing. Gen. Sts. *c.* 89, § 2. Pub. Sts. *c.* 120, § 3.

If the agreement, together with the plan accompanying, of December 31, 1864, did not constitute by its acceptance any contract that this triangle should be kept open, or any dedication of it to public use, whether as a street, square, or public area, — and we are of opinion that it did not, — the St. of 1866, *c.* 68, cannot have enlarged the effect of the indenture. This confirms the indenture, authorizes changes in the laying out of lands and streets to conform thereto under a certain proviso, and directs the widening of Dedham (now Dartmouth) Street; but it has no effect upon the construction of the instrument, nor was it so intended. It is not easy to see, had it been thus intended, how it could have such effect, so far as the rights of the parties other than the Commonwealth are concerned.

It is not possible to reinforce the evidence of the plan by evidence of an agreement previously made, not attested by any writing, but either oral, or resting only upon acts done by the servants of the Boston Water Power Company, which tend to show an intention on their part to dedicate this tract to public use. Whatever the previous contracts or intentions of the parties, that expressed by the indenture and the plan to which it refers must govern, as all that had passed before in the way of negotiation was merged in them.

We are therefore of opinion, that, by the deed and plan accompanying it, there was neither a contract on the part of the Boston Water Power Company that this tract should be either a street or a park, nor was it thereby dedicated to the public, and the dedication accepted. We are not sure that we always understand the terms "dedication" and "acceptance" as used by the relators in their argument. If all that is meant thereby is, that, by becoming parties to the indenture of December 31,

1864, the Boston Water Power Company agreed that this tract should be either a street or park, and the other parties to the indenture assented thereto, and there was thus constituted a dedication and acceptance of it as such, we have disposed of this position in holding that there was no such agreement. Apparently the relators also rely upon facts which occurred subsequently to the date of the indenture as establishing a dedication and acceptance, and it is proper briefly to consider them.

There is evidence that, after the indenture was thus executed, the tract was treated by some of the officers of the Boston Water Power Company as if it were to be kept open; and they testify that they considered that it was to be thus held by the company; that it was filled in by the city at its own expense; that, for some years, it was not taxed; that it was not enumerated in an important schedule of property of the company; and that land was sold by the company by reference to plans upon which this appeared as an open space. But, when the fullest force is given to this evidence, no easement like that here claimed can be deemed to have been thereby dedicated to the public. Whatever may have been the intention of its president or other officers, not authorized as such to convey the lands of a corporation, it will not be deprived of the beneficial use of its property because they have seen fit for a few years to treat it as surrendered to the public, either by their declarations, their conduct, or their neglect. Such evidence cannot add a new clause to a contract before made, nor is such contract to be construed in the light of such facts.

These subsequently occurring facts cannot establish a dedication of this tract which enables the relators to maintain this proceeding. The Commonwealth may certainly enforce the provisions and restrictions of the indenture, against all persons bound by them, by information in equity in the name of the Attorney General. *Attorney General* v. *Gardiner*, 117 Mass. 492. But if, by any subsequent acts, the company has dedicated this tract to the city as a park, or as an addition to the width of the street, assuming that such a dedication could be made by it, or if it has, by deeds or other instruments, expressly or impliedly contracted with any one that it shall remain open, it is for those injured to complain; the Commonwealth is not

charged with the enforcement of their private rights. There has certainly been no acceptance of any dedication on the part of the Commonwealth. It quitclaimed its interest in a passageway through the lot on which Trinity Church stands. The words " open square " found where this triangle is situated on the plan accompanying the deed to Trinity Church as made by the commissioners is the only act done by the Commonwealth in recognition of the existence of this triangle as an open space, and it is of little importance in view of the fact that on the plan of lands signed by the Commissioners on Public Lands, according to which fourteen auction sales of land, from 1865 to 1872, have taken place, the tract is shown as land of the Boston Water Power Company, and is in no way delineated as a street, square, or park.

Even if the acts tending to show dedication of this tract to public purposes would be sufficient at common law to establish it, — a proposition we by no means concede, — the evidence appears to be conclusive that there was no acceptance of it on the part of the city. As early as August, 1866, the Boston Water Power Company conveyed a portion of this triangle to the city as a street. Again, on May 16, 1876, the city took another portion of the triangle for the same purpose. Again, it subsequently took yet another portion to add to Trinity Place, and paid for it, thus unequivocally recognizing the ownership of the company in the lot. The city has taxed it repeatedly, has sold it for non-payment of taxes, and apparently does not now make any claim to an easement therein.

Indeed, it was not in the power of the city to accept a dedication made, or attempted to be made, subsequently to the indenture of December 31, 1864, by acts such as those on which the relators rely, unless it did so by laying out that which was thus dedicated as a part of the highway. St. 1846, c. 203. Pub. Sts. c. 49, § 94. This difficulty is not disposed of by treating the triangle as a park, or other public area. Before the St. of 1846, c. 203, a town might accept a square or open space as a part of the public highway, those acts only having been done which are held necessary to constitute dedication and acceptance at common law. *Commonwealth* v. *Fisk,* 8 Met. 238. After the passage of that statute, it was necessary that the same should be

laid out as a highway. No power was given to cities and towns to accept public parks as such until the St. of 1882, *c.* 154.

In the view we have taken of this case, it is unnecessary to consider whether the defendant is a *bona fide* purchaser for value from the Boston Water Power Company, and whether as such he has any rights superior to theirs.

A majority of the court are of opinion that the entry should be                                     *Information dismissed.*

*G. O. Shattuck & J. C. Ropes,* for the relators.

*D. Foster & H. D. Hyde,* (*A. D. Foster* with them,) for the defendant.