ATTORNEY GENERAL *vs.* GEORGE C. ABBOTT.

Bristol.    October 28, 29, 1890. — September 3, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP.
& BARKER, JJ.

*Park — Dedication to the Public — Acceptance.*

In 1866 six landowners united in a plan to establish a seaside resort, and became the sole stockholders and directors of a land company, to which the land was conveyed, four directors forming a quorum and having the powers of the entire board. The land was laid out, and plans were prepared showing among the lots open spaces, one, afterwards called Ocean Park, being delineated on a plan recorded in August, 1867. Other land was bought, and a new plan recorded in 1870, showing three parks, including Ocean Park, which alone was somewhat changed in boundary as appeared on a plan dated June, 1871. A few lots were sold in 1867 and 1868, and later sales were rapid and numerous. Printed copies of the plans, that of 1867 with Ocean Park added, were widely circulated as advertisements of the sale of lots, and were kept in the directors' room for free distribution. At the outset those interested discussed the leaving of such spaces open, the lots fronting thereon being deemed preferable, and at sales assurances were freely given that they would always be kept open. Four of the directors declared that it was the intention to make these spaces public parks; another admitted that he had seen and himself given away the plans; and the remaining one, who thought too much land was devoted to parks, afterwards acquiesced in the opinion of the majority. These spaces were used by the public as parks before the year 1880. *Held*, upon an information filed in August, 1887, to prevent interference with the public use of the parks by one to whom the company attempted to convey them in 1885, that there was an intention on the part of the owners to dedicate them to the use of the public as parks, and that the same had been used by the public enough to show an acceptance thereof.

The acceptance of a dedication of land to the public at common law need not be very specific or appear of record, and need not be by the town in which the land lies.

Upon the dedication of a park to the public at common law, the fee remains in the original owners.

The grantee of land of which a previous dedication has been made to the public is bound by such dedication, whether it appears of record or not, and cannot claim to be a *bona fide* purchaser for value, especially if he is put upon inquiry, and makes a laborious investigation of the facts, and pays much less than the value of a clear title to the land.

INFORMATION, filed August 17, 1887, by the Attorney General, to prevent the defendant from interfering with Ocean Park, Hartford Park, and Waban Park, so called, in Cottage City, to which he claimed title under a deed from the Oak Bluffs Land

Company, dated April 28, 1885. The case was heard in 1889, by *Field*, J., upon the pleadings and evidence reported by the commissioner and special master, and was reserved by him for the consideration of the full court, such decree to be entered as justice might require. The facts appear in the opinion.

The case was argued at the bar in October, 1890, and afterwards, in June, 1891, was submitted on the briefs to all the judges.

*J. D. Ball & G. C. Abbott*, for the defendant.

*T. M. Stetson & H. M. Knowlton*, for the Attorney General.

ALLEN, J.   A perusal of the voluminous evidence, aided by the full briefs of counsel, shows to our satisfaction that there was an intention on the part of the owners of the parcels of land called Ocean Park, Hartford Park, and Waban Park to dedicate them to the use of the public as parks, and that the same were used by the public enough to show an acceptance thereof prior to the year 1880.

It will not be useful to state in much detail the evidence which leads to these results, or to discuss the particulars in which witnesses disagree or contradict each other. The general features, however, are as follows. In 1866, six persons united in a plan for making a place of summer resort at Oak Bluffs in Edgartown. One of them already owned a large lot of vacant land which was deemed suitable for the purpose. Each of the five others purchased an undivided sixth part thereof. A professional landscape gardener, Mr. Copeland, was employed to lay out the grounds in such a manner as would be likely to attract people who should come there only for the summer, and to induce them to buy lots, build cottages, and establish a village. In 1867 a deed of the premises was made to two of their number, as trustees for the benefit of the six owners; and in 1868 an act of incorporation was obtained, and the land was conveyed to the corporation. The sole purpose of the corporation was the holding, improving, and disposing of the land and a wharf then held by the two trustees, with power also to purchase, hold, improve, and dispose of other adjacent lands. St. 1868, c. 60. At the outset the original six owners constituted all of the stockholders of the corporation, and they all became directors. According to the by-laws, four directors constituted a quorum, with full power

to do all that the full board of directors could do ; and the directors were to prepare the real estate of the company for sale, make sales thereof, expend all moneys, and dispose of all other property of the company in such manner as they should judge best calculated to promote the object of the company and advance the interests of the stockholders, and make such improvements as they might deem advisable.    Plans for laying out the proposed village were prepared by Mr. Copeland, showing open spaces not divided into lots.    These plans underwent certain changes in matters of detail.    One plan, recorded August 20, 1867, showed such an open space, to which, on later plans, the name of Ocean Park was given, though with a change of limits.    After this, and after the corporation was formed, other land was bought, and a new plan was made, which was recorded May 7, 1870, showing the three parks now in controversy, described by their names.    After this there was no change in the boundaries of Hartford Park and Waban Park, but there was a change in Ocean Park.    A new plan was made, dated June 1, 1871, showing Ocean Park with somewhat modified boundaries, and the other parks as in the earlier plan, and this was recorded July 5, 1871.    Still another plan was made in 1871, showing the three parks without change of limits, and this was recorded in 1873.    A few lots were bargained for in 1867, but no sales were actually completed till 1868, after which lots were rapidly sold, to the number of five hundred within three years.    Copies of the several plans were struck off and widely circulated.    The printed copies of the plan which was recorded August 20, 1867, had the name of Ocean Park added.    Some of these were framed and hung up in hotels, steamboats, railroad stations, and other public places.    Very many were distributed through the mails.    During all the period of settling the plans great pains were taken to give wide publicity to them, not only in the above methods, but by circulars and advertisements calling attention to them, and by printing a reduced copy of one or more of them upon letter sheets.    Copies of the plans were also kept in the directors' room, for free distribution.

The testimony makes it very plain that the establishment of open spaces or parks was deemed an important feature of the scheme for selling lots.    At the outset it was a matter of discus-

sion among the parties interested. Lots fronting upon the parks, or having an unobstructed view of them, were deemed more attractive. Assurances were freely given by those having charge of the sale of the lots that these spaces or parks should always be kept open. Four of the original owners testify in distinct terms that it was the intention of those interested in the enterprise to make them open parks, free to the public forever. This is so extremely natural and probable, and any other course would be so unlikely, that evidence of a contrary intention on the part of any one of them would be received with some distrust. If the corporation had announced, at the time of making the sales, that it reserved the right to cut up the open spaces into building lots, and to sell them after the village should be established, it would no doubt have diminished the sales. If the corporation had an intention to reserve this right, the course pursued of inviting purchasers was inconsistent with common honesty.

The defendant concedes that some of the original owners and stockholders in the corporation gave such assurances to purchasers, and in various ways gave wide publicity to the plan of having these places kept open as public parks; but he contends that two of them did not assent to this course. One of these, Mr. Darrow, died in 1871; the other was a witness in the case. As to both of these the evidence is satisfactory to show that they assented to the plan in manner and form as it was put forth to the public. Mr. Darrow at the outset thought too much land was devoted to the parks, but after discussion acquiesced in the opinion of the majority. The other one, while in his direct testimony he denied that he ever assented to the plan, or that there was ever any authority to bind the owners of the land or the corporation by a dedication of the parks to the public, yet admitted that he knew of the existence of the plans, and of their being on record, that he had seen them at many places, and that he gave away some of them himself; probably some of each. The defendant also suggests that one Worth was interested, and never assented to the dedication. Worth held a bond from Bradley, one of the original owners and stockholders, for one half of Bradley's share of the proceeds of sales, but his title was not such as to

give him a voice in the proceedings, or to make his assent or dissent material. He did not become a stockholder in the corporation till 1877.

Without dwelling upon various other particulars of the evidence which tend in the same direction, we cannot doubt that it was a part of the scheme of the enterprise or speculation that the public should understand that these spaces should be left open for public use, and that no right was reserved to sell them for building lots; that the corporation held out to the public this assurance, and at the time fully and fairly intended to give up this right; and that the two persons upon whose supposed dissent the defendant relies did not in fact dissent at the time. If they had done so, their dissent would be overborne by the action of the other four; but it seems to us more reasonable and probable to suppose that at the time they acquiesced, if they did not fully concur, in the views of the majority.

It is not necessary to go nicely into the question at what time the intention to devote these open spaces to the public became fully formed. There certainly was an intention that some spaces should be left open at an early day. Before the corporation was created, a plan showing such spaces was prepared and put on record. Some changes were afterwards made in the boundaries. The land containing Waban Park was subsequently purchased. The limits of these three several open spaces were finally settled after the corporation was formed. For a time there was a somewhat fluctuating intention, so far as limits and boundaries were concerned. But the limits as shown on the last two plans may be taken as representing the final conclusion of the corporation as to the limits of the spaces that were to be left open.

The fact that not much was done to adorn these spaces, and that the corporation itself did whatever was done in this respect, and to some extent assumed to exercise a certain control over the land, is not of much weight in opposition to the conclusion to which we have come. The chief element of a public park in such a place, at least till the village is well settled, is to have the land kept open. The adornment would naturally come later, if at all. The corporation did a little towards improving and caring for these open spaces. It had some interest in doing so. Ordinarily, when parks are established for public use, the munici-

pal authorities exercise control over them. Washburn on Easements, 146, 147, 156. It was not so here. Whatever was done was done by the corporation, which to some extent did what municipal authorities usually do. The corporation was interested in pushing its speculation, and as long as it had many lots left for sale it did something for the parks; but afterwards they were much neglected.

On the whole, we think the evidence is sufficient to show an offer to the public of the spaces shown on the last two plans as Ocean Park, Hartford Park, and Waban Park. In *Attorney General* v. *Whitney*, 137 Mass. 450, where a majority of the court thought there was not sufficient evidence of such an intention, the evidence of dedication was far less strong.

The acceptance of such a dedication at common law need not appear of record, and need not be by the town. The acceptance is by the public at large, and the principal thing to show it is use by the public. Washburn on Easements, 128, 139, 140. There is no need of a formal grantee. The fee remains in the original owner. *Cincinnati* v. *White*, 6 Pet. 431. No assent of the town is necessary, because no burden is put upon the town, as in the case of a way. The improvements upon a park thus dedicated are left to be made by those who are interested. The town may take it up, or it may be left to individuals. If in a seaside summer resort no improvements at all are made, there will still be some benefit from having a space left for air, and for an open, unobstructed prospect. Whether the easement of a public park could be accepted merely by enjoying an unobstructed view over it of the ocean, need not be considered. Various other acts of use of all the parks are shown, sufficient to show an acceptance of them by the public. Such acceptance need not be very specific.

The defendant contends that such acceptance must have been by the town of Edgartown originally, or by the town of Cottage City afterwards. The chief argument in support of this view is, that there must be somebody who can be held responsible for the abatement of a nuisance, if one should exist upon the property; and that if the dedication is not to the town, and accepted by the town, there is virtually no owner of the property. This argument is of force, but the technical answer is that the fee remains

in the original owner. The dedication for a park carries only an easement. This easement is not in the town, but it is in the public at large. There may be inconveniences in this doctrine, in cases which are supposable and possible, but the doctrine itself has been widely adopted, and has been expressly recognized as in force in this Commonwealth. *Abbott* v. *Cottage City*, 143 Mass. 521. We need not consider whether this mode of accepting a park has been done away with by the St. of 1882, c. 154.

The defendant further contends that he was a *bona fide* purchaser for value, without notice, and that his title should therefore be protected. This argument, however, cannot prevail, for two reasons. In the first place, purchasers of real estate must take notice of such a fact as a dedication to the public, in like manner as they must take notice of a title gained by adverse possession. There are various infirmities to which titles apparently good on the records are exposed. *Gillespie* v. *Rogers*, 146 Mass. 610, and cases there cited. If a dedication has become complete, the original owner cannot afterwards resume control, or convey the land free from the easement of the public, any more than if the easement had been gained by prescription. Washburn on Easements, 139. Goddard on Easements, 181. 2 Greenl. Ev. § 662. *Trustees of Methodist Episcopal Church* v. *Hoboken*, 4 Vroom, 13.

Moreover, in the present case, the defendant was fully put upon inquiry as to the facts, and made a laborious investigation of them, but came to a conclusion, either upon the law or upon the facts, different from that which we have reached. Under such circumstances it cannot be held that he was a purchaser without notice. The price which he paid was far less than the value of the land, provided the title was clear, and whatever may have been the defendant's opinion as to the validity of his title, he certainly had reason to know that it was liable to be questioned.

*Decree for the plaintiff.*