JOHN P. REAGAN & others[1] *vs.* LOUISE BRISSEY & others.[2]

No. 04-P-1732.

Suffolk. May 5, 2005. - July 29, 2005.

Present: ARMSTRONG, C.J., PERRETTA, & GREEN, JJ.

Further appellate review granted, 445 Mass. 1105 (2005).

*Easement. Real Property,* Easement, Deed. *Deed,* Construction. *Taxation,* Real estate tax: redemption.

A Land Court judge did not err in concluding that certain landowners in a subdivision did not hold an implied easement to use as parklands four parcels of land in the subdivision, to which a town held tax title, subject to the individual defendants' unforeclosed right of redemption, where there was no evidence that the subdivision plan showing the disputed parcels as parks was used to promote sales of the lots in the subdivision, or that the subsequent conduct of the parties manifested an understanding that the disputed parcels were subject to an implied easement [159-163]; further, the fact that the land had been developed and sold in small building lots for use as seaside vacation residences was merely one factor to consider, and not determinative of the issue [163-164].

CIVIL ACTION commenced in the Land Court Department on December 6, 2001.

The case was heard by *Karyn F. Scheier,* J., on motions for summary judgment.

*Daniel C. Perry* for the plaintiffs.

*Kenneth L. Kimmell* for the defendants.

PERRETTA, J. This appeal brings before us the question whether

[1]Lisa A. Reagan, Matilda H. Smith, Louise Pearce, Anne Gallagher, Louis Winkleman, James B. Lockhart, Ruth D. Lockhart, Ray Pearce, Leanne Pearce, Emil Drottar, Donna Drottar, Renee Balter, Bruce Balter, Alex Walley, and the East Chop Association, Inc. (a Massachusetts nonprofit corporation formed for the purpose of preserving and maintaining open space in the town of Oak Bluffs). We will refer to them collectively as the plaintiffs.

[2]Roslyn M. Yenzer, Roslyn Luce Sadler, the town of Oak Bluffs, and Ocean Park Realty, Inc. (a real estate agency assisting in the sale of the land in issue).

the Land Court judge erred in concluding that the plaintiffs do not hold an implied easement to use as parklands four parcels of land, to which the town of Oak Bluffs (town) holds tax title, subject to the individual defendants' unforeclosed right of redemption. The plaintiffs also sought to permanently enjoin any sale of the parcels for residential development. We affirm the judgment denying them declaratory and injunctive relief.

1. *The undisputed facts.* We take the facts as the judge set them out in her detailed and comprehensive decision.[3] There is no dispute that all the individual plaintiffs own various lots of land shown on a recorded "Plan of Bellevue Heights, Martha's Vineyard" dated 1872. Our recitation of the facts is, by necessity, lengthy, and begins with the recorded plan of 1872.

On June 22, 1872, Tarleton C. Luce recorded with the Dukes County registry of deeds a "Plan of Bellevue Heights, Martha's Vineyard," subdividing a tract of land situated in Vineyard Haven Harbor in the East Chop section of Martha's Vineyard.[4] The plan shows the tract divided into numerous, small, numbered building lots, approximately fifty by one hundred feet in dimension, laid out in a regular pattern of blocks, bounded by streets. Crystal Lake is situated at the northwestern perimeter of the tract. The building lots are, generally speaking, situated to the east of Crystal Lake. There are also four larger, unnumbered parcels depicted on the plan, labeled "Prospect Park" (the area of which is comprised of two of the parcels), "Webster Park," and "Plaza." It is these parcels that are in dispute. They are situated at various points along the eastern side of Marginal Street.[5] Webster Park and the Plaza are bounded to the east by Park Street, which bisects Prospect Park.

By a recorded deed (the Smith deed) dated September 4,

---

[3]Although this matter originally came before the judge on cross motions for summary judgment, the parties subsequently agreed to have the controversy considered on a "case stated" basis.

[4]It appears that an earlier plan of Bellevue Heights was recorded in 1871. However, the judge was not provided with a copy of that plan.

[5]Prospect Park, the northernmost parcel, is bounded to the west by Marginal Street; the Plaza is situated at a juncture of Marginal and two other streets; Webster Park is set back from Marginal Street and is separated from it by an area designated as "The Pool."

1872, Luce conveyed thirteen of the lots shown on the recorded plan to the Reagans' predecessors in interest: Lorenzo Smith, James S. Smith, and Hannah B. Dias. According to the deed, "all the right, title and interest . . . in thirteen lots of land situated at a place called East Chop in the Town of Edgartown [now part of the town], and numbered on the plan of Bellevue Heights, and designated on said plan by the numbers, as follows, to wit: [lots 128 through 132 and lots 169 through 176]." The Smith deed makes no reference to a "park" or "plaza." Plaintiffs John and Lisa Reagan acquired lots 174, 175, and 176 by a recorded deed from one James P. McDonough, dated December 2, 1995.

In September, 1873, Luce placed an advertisement in a local newspaper, the Vineyard Gazette, offering lots of land for sale. The advertisement promoted Bellevue Heights as a "pleasant and healthy seaside resort." It highlighted the proximity of Bellevue Heights to the grounds of the Martha's Vineyard National Camp Meeting Association and its "command [of] a fine view of the harbor." It also boasted of cool and refreshing sea breezes, accessibility of steamship services, and the suitability of the environs for seaside recreations, vis-à-vis boating, fishing, and saltwater bathing. A reader of the advertisement was also informed:

> "The land has been tastefully laid out in building lots measuring generally 50 by 100 feet, which are being disposed of at prices that insure a ready sale. Lithographic plans of BELLEVUE HEIGHTS, and any desired information in regard to lots, their situation and price, may be had on application to TARLETON C. LUCE, Vineyard Haven P.O., Mass."

The advertisement made no express reference to parks or other areas reserved for open spaces. By way of comparison, the Oak Bluffs Land and Wharf Co. placed a similar newspaper advertisement offering for sale "summer residence[s] by the sea" on grounds "tastefully laid out in lots, avenues, *parks* and drives" (emphasis supplied), and a third developer proclaimed the availability of "lots extra large, fronting on large parks" (emphasis supplied).

During the late 1800's, the Oak Bluffs area experienced a

period of robust development due in great measure to the residential summer community developed by the Oak Bluffs Land and Wharf Co. As discussed in *Attorney Gen.* v. *Abbott,* 154 Mass. 323, 324-326 (1891), that company engaged one Robert Morris Copeland to prepare its plans to establish a seaside resort, and the land was laid out in small cottage lots, with avenues and parks. Notwithstanding this development boom, Tarleton Luce and one William H. Wharff filed for bankruptcy in February, 1874.[6] On April 14, 1874, they conveyed to their trustees in bankruptcy "all the property of whatever kind, of which we are possessed or in which we were interested . . . both individually and as copartners, under the style and firm name of T. C. Luce and Company."

By a recorded deed dated May 7, 1880, the bankruptcy trustees, in turn, conveyed to Ichabod N. Luce, as a purchaser for value, "all of our interest, rights and title to certain Real Estate . . . at a place called 'Bellevue Heights,' and comprising Avenues and Parks . . . shown on [the 1872 plan]. . . . Said rights, title and interest being only what remained to T. C. Luce aforesaid after selling lots as per said plan." The individual defendants are descendants of Ichabod N. Luce and acquired title to the disputed parcels by descent or devise after generations of intrafamilial transfers.[7] Some, but not all, of the instruments and probate records in the individual defendants' chain of

---

[6]Apparently Luce had acquired a partner in his business dealings. The record is silent in respect to the extent of their association but that information is irrelevant to the issues before us.

[7]Ichabod died testate, leaving "[a]ll to son Frederick O. Luce." Frederick died intestate. The inventory of his estate referred to lots of land situated in Bellevue Heights. His heirs were Sarah Jane Luce (widow), Abbie O. Luce (daughter), and Byron P. Luce (son). By a deed dated April 4, 1923, Sarah, Abigail L. Smith, and Royal E. Smith, presumably Frederick's widow, daughter, and son-in-law, conveyed to Byron P. Luce "[a]ll our right, title and interest of whatever name or nature or description in and to any and all lots of land located at Bellevue Heights, Oak Bluffs, Mass. however they may be plotted, numbered or described . . . ." Byron died testate, devising all to his widow, Lotta C. Luce. The inventory of his estate did not include any real estate. Lotta died testate, devising "[a]ll to two daughters [Eleanor Luce Mott and Roslyn Luce Sadler] equally." The inventory of Lotta's estate referred to lots 34, 35, 46, 482, 479, 680, 681, and 682, Bellevue Heights. Eleanor apparently died at some time after the parcels in dispute were taken by the town for nonpayment of taxes. Eleanor was an original defendant in this action, and a subsequent motion to substitute Louise Brissey and Roslyn M. Yenzer was

title refer to interests in land located at Bellevue Heights. None, however, makes express reference to parks.

One of the plaintiffs, Louise Pearce, is now in her eighties and has been a lifelong visitor to Bellevue Heights. Her parents owned property in the Bellevue Heights subdivision, and she currently owns lots 309 and 310, as shown on the 1872 plan. Pearce averred in her affidavit that during the entire time that she has visited Bellevue Heights, she and her family have "regularly" used the "Plaza" parcel for passive recreational activities such as walking, hiking, and nonorganized games, and that she has seen others using "Webster Park" and "Prospect Park" for similar recreational purposes. Louise Pearce's son, plaintiff Ray Pearce, made statements to the same effect in his affidavit.

At the present time, the town holds tax title to the disputed parcels subject to the individual defendants' unforeclosed right of redemption. In an effort to pay the owed taxes and redeem some of the property in dispute, the individual defendants listed the parcels for sale with defendant Ocean Park Realty, Inc. The individual defendants also entered into a purchase and sale agreement for one of the disputed parcels situated on Monahegan Avenue with a buyer who intends to build a single-family residence on that lot. John Reagan also sought to acquire that parcel, albeit unsuccessfully.

After his failed bid to purchase that parcel, Reagan and his wife Lisa brought this action seeking a declaration that the disputed parcels are subject to an equitable servitude in favor of the residents of Bellevue Heights and a permanent injunction against the sale of the parcels for residential development.[8]

2. *The judge's decision.* Based on the case stated record, the judge concluded that the rights alleged by the plaintiffs were in the nature of a claim of an implied easement rather than an

---

unopposed, and allowed. Defendant Louise Brissey stated in her affidavit that she and her sister, defendant Roslyn M. Yenzer, are, by her mother's will, heirs and coowners of the disputed parcels. The plaintiffs dispute the validity of Brissey's and Yenzer's claims of title, be it by way of descent or devise.

[8]The Reagans were allowed to amend their complaint to add the other named plaintiffs.

equitable servitude.[9] As correctly noted by the judge, easement rights arise from the intention of the parties to create them, as shown by the language of the deed and the circumstances surrounding its execution. See *Carroll* v. *Hinchley*, 316 Mass. 724, 729 (1944). Any reference to the 1872 plan, she determined, was a suggestion of an intent to establish parks as an amenity for residents of Bellevue Heights.

In looking to the circumstances surrounding the sale of the lots, however, the judge found nothing to show that Luce had promoted the existence of parks as an amenity to the subdivision, that no person had ever assumed control over the parcels to provide for their maintenance and use as parks, and that there had been no substantial use of the parcels for recreational or park purposes. For these reasons, the judge concluded the plaintiffs had failed to carry their burden of showing that the disputed parcels are impressed with an easement.

3. *The issues.* There are two issues before us. The plaintiffs contend, first, that the judge erred in concluding that the plan showing the disputed parcels as parks was not used to promote the sale of the lots and that the conduct of the fee owners and residents failed to manifest an understanding that the disputed parcels were subject to an implied easement. The plaintiffs' second contention, as we understand it, is that the judge was also in error in failing to recognize or give due weight to the very nature of Luce's general scheme of development of the tract as a seaside recreational community, particularly in light of its proximity in time and place to the parks at issue in *Attorney Gen.* v. *Abbott*, 154 Mass. 323 (1891).

4. *Discussion.* "[W]e have before us everything which was before the trial judge, and we decide the questions of law

---

[9]The judge's conclusion, with which we agree, that the plaintiffs could not make out a successful claim of an equitable servitude was based on the reasoning that an equitable servitude was a property interest and restriction (see *Labounty* v. *Vickers*, 352 Mass. 337, 347 [1967]; see also *Belmont* v. *Massachusetts Amusement Corp.*, 333 Mass. 565, 572 [1956]; *Burritt* v. *Lilly*, 40 Mass. App. Ct. 29, 31-33 [1996]) subject to the Statute of Frauds, see G. L. c. 184, §§ 23, 26-30. See Restatement of Property (Servitudes) § 532 (1944). On appeal, the plaintiffs continue to characterize their asserted right in terms of an equitable servitude. However, they do not argue that the legal principles governing the creation of implied easements are inapplicable to the circumstances presented.

involved unaffected by [her] decision." *Tucci* v. *DiGregorio*, 358 Mass. 493, 494 (1970). We begin our analysis by setting out the controlling principles of law, starting with *Jackson* v. *Knott*, 418 Mass. 704, 712 (1994), and the court's affirmation of longstanding precedent:

> " '[I]t is well established that "where land is conveyed with reference to a plan, an easement . . . is created only if clearly so intended by the parties to the deed." ' *Scagel* v. *Jones*, 355 Mass. 208, 211 (1969), quoting *Rahilly* v. *Addison*, 350 Mass. 660, 662 (1966). See *Wellwood* v. *Havrah Mishna Anshi Sphard Cemetery Corp.*, 254 Mass. 350, 354 (1926), quoting *Prentiss* v. *Gloucester*, 236 Mass. 36, 52 (1920) ('a reference to a plan in a deed, although accompanied by its use for description or bounds, does not result in the conveyance of rights not necessary for the enjoyment of the premises, in the absence of an intent appearing to that effect')."

See *Light* v. *Goddard*, 11 Allen 5, 8 (1865); *Bacon* v. *Onset Bay Grove Assn.*, 241 Mass. 417, 422-423 (1922); *Dale* v. *Bedal*, 305 Mass. 102, 103 (1940); *Carroll* v. *Hinchley*, 316 Mass. at 729.

In construing the language of the deed, we may look to the circumstances surrounding the transaction in order to determine the intent of the parties to the deed. In cases involving the designation of parks or open spaces on a subdivision plan, evidence of intent may also be found in the "conditions existing at the time when the deed was made," *Bacon* v. *Onset Bay Grove Assn.*, 241 Mass. at 423. For example:

> "The great increase in real estate development in modern times, the divisions of large tracts into small lots, and the promotion of sales by schemes which affect the use of the land by a neighborhood or community rather than by individuals as such, the necessity, which formerly was not so urgent, for open spaces and parks, the needs of a community designed largely for rest and recreation in vacations, and the fact that the general scheme of development was into lots of small size, all may be considered."

*Ibid.* Cf. *Attorney Gen.* v. *Abbott*, 154 Mass. at 325-326. As

also explained in *Bacon* v. *Onset Bay Grove Assn.*, 241 Mass. at 423, quoting from *Hurd* v. *General Elec. Co.*, 215 Mass. 358, 361 (1913), subsequent use of the land sometimes may also be considered:

> "Where the intent is doubtful, the construction of the parties shown by the subsequent use of the land may be resorted to, if such use tends to explain or characterize the deed, or to show its practical construction by the parties, providing the acts relied upon are not so remote in time or so disconnected with the deed 'as to forbid the inference that they had relation to it as parts of the same transaction or were made in explanation or characterization of it.' "

It is also important to point out that the plaintiffs, as the parties asserting an implied easement, bear the burden of proving its existence. See *Cheever* v. *Graves*, 32 Mass. App. Ct. 601, 607 (1992).

With these controlling principles in mind, we take up the plaintiffs' contention that the judge erroneously concluded that the plan showing the disputed parcels as parks was not used to promote sales of the lots and that the conduct of the parties failed to manifest an understanding that the disputed parcels were subject to an implied easement. While we recognize that the nature and design of a development can give rise to an inference consistent with an intent on the part of a grantor to reserve open space for common use, such an inference can be counterbalanced, if not vitiated, by the failure of the grantor and the grantees to acknowledge through word or deed the existence of the right claimed to exist, that is, an easement. See *Attorney Gen.* v. *Abbott*, 154 Mass. at 325-326; *Bacon* v. *Onset Bay Grove Assn.*, 241 Mass. at 423; *Carroll* v. *Hinchley*, 316 Mass. at 730.

There is no clear evidence to show that Luce made any implied or express representations to prospective purchasers in respect to the establishment of parks. The plaintiffs argue that direct evidence of Luce's intention to reserve open space for common use can be found in the advertisement that he placed in the Vineyard Gazette, the pertinent portions of which we have set out, *supra*. As can be seen from the advertisement promoting Bellevue Heights as a seaside vacation community, it

speaks solely to the amenities afforded by its proximity to the sea in respect to its natural surroundings, to land described as "gently undulating, with a gradual slope northward towards the water . . . [and] laid out in building lots measuring generally 50 by 100 feet."

Although the advertisement is written in a detailed and expansive manner that emphasizes the simple life in a pleasant and natural environment, it is silent on the matter of parks or other open spaces. The omission of any such reference is particularly notable when considered with the earlier mentioned, similar advertisement placed by the Oak Bluffs Land and Wharf Co. in which the land there for sale was described as "tastefully laid out in lots, avenues, parks and drives," as well as another developer's printed proclamation of the availability of "lots extra large, fronting on large parks." Although Luce's advertisement does state that "[l]ithographic plans of BELLEVUE HEIGHTS. . . may be had on application" to Luce, there is nothing to show that the reference is to the 1872 plan or whether anyone even made application for the plans. Standing alone, the advertisement provides, at best, minimal weight in support of the plaintiffs' claim that the establishment of parks was an important feature of the marketing scheme for the lots. Contrast *Attorney Gen.* v. *Abbott*, 154 Mass. at 325-326 (plans were widely disseminated in connection with marketing of lots, sales agents made express representations to prospective purchasers concerning establishment of parks, and developers admitted intention to create parks).

Nor do we see anything in the record before us that establishes that the subsequent use of the disputed parcels, historic or current, gave rise to an implied easement. What evidence of use is before us falls far short of showing open and continuous neighborhood use consistent with the alleged implied easement. Contrast *Carroll* v. *Hinchley*, 316 Mass. at 726 (picnic tables, swings, and benches located on plot designated as "Park," which also provided access to and view of lake for some of surrounding lots, safe place for children to swim, and use for mooring of canoes and boats as well as sliding and skating in winter).

The plaintiffs' final argument in support of their first conten-

tion is that we should infer an implied recognition of their ease-
ment rights from the fact that the fee owners of the disputed
parcels never developed them. They claim that such an infer-
ence is supported by the omission of any express reference to
"parks" in the instruments and probate records showing the
individual defendants' chain of title. The plaintiffs contend that
this omission indicates that the fee owners renounced any claim
to the disputed parcels over a century ago and manifests a
shared understanding that those parcels were subject to an
implied easement.[10]

We will not infer an implicit recognition of the specific ease-
ment rights here sought, let alone the relinquishment of a fee
interest in land, from instruments broadly written to transfer
"all" interests held in real property or from any uncertainties in
a chain of title. We think it equally likely that the failure on the
part of the defendants to develop the disputed parcels for any
purpose could be attributed, at least in part, to uncertainties in
respect to the chain of title. See note 7, *supra*.

The second contention raised by the plaintiffs, that the judge
failed to give due weight to the nature and design of the
development as a seaside recreational community, is based on
the assertion that the fact that the development scheme is similar
in all material respects to those discussed in *Attorney Gen.* v.
*Abbott*, 154 Mass. at 325-326; *Bacon* v. *Onset Bay Grove Assn.*,
241 Mass. at 423; and *Carroll* v. *Hinchley*, 316 Mass. at 730, is
sufficient to support their claim of an implied easement. They
argue that the common thread and determinative factor in each
of those cases was the character of the development scheme
itself, i.e., a densely laid out residential subdivision intended
primarily for use as seaside summer homes. More specifically,
the plaintiffs make the broad contention that the existence of
the conditions identified and discussed in those cases is
determinative of Luce's intent.

---

[10]As further support for their assertion of a shared understanding of an
implied easement, the plaintiffs point out that other maps and plans have
designated the disputed parcels as parks and that no taxes were assessed on
those parcels prior to 1994. However, the plaintiffs' argument fails to take into
account the fact that the maps upon which they rely were not prepared by
Luce. Nor do they offer a reasoned explanation as to the relevance of the
failure to assess taxes on the question of Luce's intent.

We do not give *Abbott, Bacon,* and *Carroll* the same reading as do the plaintiffs. For sure, the development and sale of small building lots for use as seaside vacation residences is a significant factor to be considered in ascertaining an intent on the part of a developer to establish parks or open space. However, factors bearing upon the question of intent are not to be examined in isolation. Rather, a determination of intent is based upon consideration of *all* the relevant evidence as may fairly be deemed to strengthen or detract from the inference of intent in light of the circumstances of the individual case. See *Dale* v. *Bedal,* 305 Mass. at 103; *Sorel* v. *Boisjolie,* 330 Mass. 513, 517-518 (1953). As stated in Restatement of Property § 476 comment a, at 2979 (1944):

> "[T]he implication [of an easement] involves a consideration of all the factors present. They are variables rather than absolutes. None can be given a fixed value. Each affects the decision as to the implication arising from all in a different degree in different situations."

There is nothing in *Abbott, Bacon,* or *Carroll* which holds or suggests otherwise. See *Selectmen of Hanson* v. *Lindsay,* 444 Mass. 502, 508-509 (2005).

*Judgment affirmed.*