JOHN P. REAGAN & others[1] vs. LOUISE BRISSEY & others.[2]

Suffolk. February 6, 2006. - April 4, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Easement. Real Property,* Easement, Deed, Restrictions. *Deed,* Construction. *Taxation,* Real estate tax: hardship exemption.

Discussion of the principles of law employed in deciding a case stated involving an implied easement. [458]

A Land Court judge erred in concluding that certain parcels of land that had been designated as parks or plazas in a subdivision plan were not burdened by an easement in favor of the plaintiffs, who were owners of one or more lots in that subdivision, where the plaintiffs satisfied their burden of proving, based on their deeds, the subdivision plan, and the circumstances attendant to and following the establishment of the subdivision, that the original owner intended to create implied easement rights to those parcels for land owners within the subdivision. [458-461]

In a civil action alleging that certain parcels of land owned by the defendants were burdened by an implied easement in favor of the plaintiffs, the contention that there was no fair or practical way to enforce any easement was not sufficient to overcome the easement [461]; further, the plaintiffs' claimed interest was not a lapsed restrictive covenant, but an affirmative easement not subject to statutory notice of restriction provisions [461-462]; finally, there was no reason to deny the existence of the easement based on a claim of tax hardship [462].

CIVIL ACTION commenced in the Land Court Department on December 6, 2001.

The case was heard by *Karyn F. Scheier,* J., on motions for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

[1]Lisa A. Reagan; Matilda H. Smith; Louise Pearce; Anne Gallagher; Louis Winkelman; James B. Lockhart and Ruth D. Lockhart, trustees of the James B. and Ruth D. Lockhart Trust; Ray Pearce; Leanne Pearce; Emil Drottar; Donna Drottar; Renee Balter; Bruce Balter; Alex Walley; and the East Chop Association, Inc.

[2]Roslyn M. Yenzer; Rosalyn Luce Sadler; Ocean Park Realty, Inc.; and the town of Oak Bluffs.

*Daniel C. Perry* for the plaintiffs.

*Ronald H. Rappaport* for town of Oak Bluffs.

*Kenneth L. Kimmell* for Louise Brissey & others.

GREANEY, J. The plaintiffs, owners of one or more lots in Bellevue Heights, a subdivision in the town of Oak Bluffs, Martha's Vineyard, commenced this action against the defendants seeking declaratory and injunctive relief in connection with proposed residential construction on four parcels of land that had been designated as parks or plazas in a subdivision plan recorded in 1872. A Land Court judge denied relief and entered a judgment declaring that the parcels are not burdened, as the plaintiffs had claimed, by an easement in their favor. The Appeals Court affirmed the judgment. *Reagan* v. *Brissey*, 64 Mass. App. Ct. 154, 164 (2005). We granted the plaintiffs' application for further appellate review. We conclude that an implied easement exists with respect to the parks.

The factual and procedural history of the case is as follows. The property comprising the Bellevue Heights subdivision was originally owned by Tarleton C. Luce (Luce). In Oak Bluffs, the subdivision is situated to the east of Vineyard Haven Harbor and Crystal Lake. On June 22, 1872, Luce recorded a "Plan of Bellevue Heights, Martha's Vineyard" (plan), which divided 165 acres of land into approximately 917 rectangular shaped and numbered buildable lots, measuring approximately fifty by one hundred feet. The plan also laid out several proposed ways and identified the four parcels at issue with the words "Prospect Park" (which consisted of two parcels divided by a proposed way), "Webster Park," and "Plaza" (collectively, the parks).

In comparison to the buildable lots, the parks are larger in area, are not numbered, and have irregular dimensions. The parks are dispersed over the subdivision, with Prospect Park located just east of the northern tip of Crystal Lake, and the other two parks located to the east of the middle and southern areas of Crystal Lake. (Crystal Lake is located to the east of Vineyard Haven Harbor, and while a proposed way designated "The Drive" was laid out on the plan on the small strip of land between the two bodies of water, no lots were laid out in that area.) None of the parks (nor lots) had water frontage because

Crystal Lake was bounded on the north, east, and south, by a proposed way designated "Marginal Street." All of the parks, however, are situated in close proximity to Crystal Lake, while only a small number of lots are bounded by Marginal Street.[3]

The individual plaintiffs are successors in interest of lots in the Bellevue Heights subdivision that were conveyed by deed by Luce.[4] The plaintiffs' deeds do not mention the parks and do not grant any express easements to use them, but the deeds do make reference to the plan.[5]

The parks are currently owned by the town of Oak Bluffs, pursuant to a taking, on June 25, 1996, for nonpayment of real estate taxes. The individual defendants, Louise Brissey, Rosalyn Yenzer,[6] and Rosalyn Luce Sadler, coown the equity of redemption in the parks. To pay back taxes and to redeem some of the parks, the individual defendants are seeking to sell (through the

---

[3]On the plan, the parks are more specifically located as bounded by the following proposed ways. Prospect Park consists of two parcels of land that are divided by Park Street. The westerly section of Prospect Park is bounded on the east by Park Street, on the north by Pall Mall (a way), on the west by Marginal Street, and on the South by Pall Mall. That portion of Marginal Street to which the parcel is bound directly abuts Crystal Lake. The easterly section of Prospect Park is bounded on the west by Park Street, and on the north, east, and south by Pall Mall. Webster Park is bounded on the east by Park Street, on the north by Webster Avenue, on the west by a triangular water body, and on the south by Park Avenue. Just west of the triangular water body is Crystal Lake. Plaza is bounded on the east by Park Street, on the north by Promenade (a way), on the west by Lake Street, and on the south by Monahegan Avenue. The northwesterly tip of the Plaza abuts Marginal Street, which, in turn, directly abuts Crystal Lake.

[4]The plaintiff East Chop Association, Inc. (East Chop), is a nonprofit Massachusetts corporation that was formed in 1939 to preserve and protect open space in Oak Bluffs. While East Chop owns a strip of land on the south side of Crystal Lake, it does not dispute the Land Court judge's observation that it could not prove that it is a successor in interest to land originally conveyed by Tarleton C. Luce. As such, all future references to the plaintiffs shall exclude East Chop.

[5]For example, the deed from which the plaintiffs John P. and Lisa A. Reagan derived title, conveyed: "all the right, title and interest which I, the said Tarleton C. Luce, have in thirteen lots of land, situated at a place called East Chop in the Town of Edgartown [now Oak Bluffs], and numbered on the plan of Bellevue Heights, and designated on said plan by the numbers, as follows."

[6]The individual defendants Louise Brissey and Rosalyn Yenzer are the heirs of Eleanor Luce Mott and, by way of motion, were substituted in her place as defendants.

defendant Ocean Park Realty, Inc.) one of the parks to a buyer who intends to build a single-family residence thereon.

The individual defendants' claim of title to the parks is disputed. The chain of title on which they rely is comprehensively set forth in *Reagan* v. *Brissey, supra* at 157-158 & n.7. Insofar as relevant here, Luce filed for bankruptcy protection in 1874 and recorded a conveyance to his trustees in bankruptcy of "all the property of whatever kind, of which [I am] possessed or in which [I was] interested or to which [I was] in any way entitled." By deed recorded in 1880, the trustees in bankruptcy conveyed to Ichabod N. Luce, for five dollars, "all of our interest, rights and title to certain Real Estate . . . at a place called 'Bellevue Heights,' and comprising Avenues and Parks on that portion of said Bellevue Heights . . . shown on [the plan]. Said rights, title and interest being only what remained to T.C. Luce aforesaid after selling lots as per said plan." The parks have never been referred to in any deed since 1880.

In 1894, the will of Ichabod N. Luce was allowed which left "[a]ll to son Frederick O. Luce." Frederick O. Luce later died intestate. In 1923, the heirs of Frederick O. Luce, by a recorded deed, conveyed to Byron P. Luce (Frederick's son) all their "right[,] title[,] and interest of whatever name or nature or description in and to any and all lots of land located at Bellevue Heights, Oak Bluffs, Mass. however they may be plotted, numbered or described."[7] The individual defendants claim title to the parks as heirs of Byron P. Luce.

On September 12, 1873, Luce marketed the "building lots" of the Bellevue Heights subdivision by placing an advertisement in the Vineyard Gazette for a three-month period. The advertisement described the subdivision as a "Pleasant and Healthy Seaside Resort" with harbor views and "gently undulating" lands and promised "a pleasant retreat during the 'heated term.' " The advertisement went on to provide:

---

[7]The individual defendants acknowledge one problem in their chain of title, namely, the lack of any proof that the heirs of Frederick O. Luce actually owned the parks. We assume, but do not decide, that the individual defendants can establish valid claims of title.

"Such a spot as this the poet must have seen or imagined when he said,

"There is a pleasure in the pathless woods;

"There is a rapture on the lonely shore;

"There is society where none intrude;

"By the deep sea, and music in its roar."[8]

The advertisement more specifically described the subdivision as follows: "The land has been tastefully laid out in building lots measuring generally 50 by 100 feet, which are being disposed of at prices that insure a ready sale. Lithographic plans of BELLEVUE HEIGHTS, and any desired information in regard to lots, their situation and price, may be had on application . . . ." The advertisement did not mention the existence of any parks in the subdivision. Luce sold the lots in groups for prices ranging from $1,025 to $3,500. The amount ranged from $113 to $291 per lot.

The Bellevue Heights subdivision was not the first on Martha's Vineyard. Some of the history of the development of subdivisions on the island has been traced by the Martha's Vineyard Campmeeting Association, the Oak Bluffs Historical Commission, and by Henry Beetle Hough in his book Martha's Vineyard: Summer Resort 1835-1935 (1935) (Hough).

From the beginning of the Nineteenth Century, religious camp meeting grounds, many Methodist in origin, but also including other denominations, were an underground American phenomenon. Hough, *supra* at 34. In 1835, the first of these meetings was established on Martha's Vineyard, near the Vineyard Sound side of East Chop. *Id.* at 35. This congregation grew and became known as Wesleyan Grove. *Id.* at 63. People of the congregation first slept in tents, which later were replaced with cottages. *Id.* at 65.

In 1866, a group of investors formed the Oak Bluffs Land and Wharf company and purchased approximately seventy-five acres of land adjacent to the Wesleyan Grove property, bordering Vineyard Sound, and also constructed a wharf to service the

---

[8]The quotation is from Lord Byron, Childe Harold's Pilgrimage, canto iv, verse 178.

property. The Company engaged Robert Morris Copeland, a Boston landscape gardener, to prepare plans of a residential summer community. Copeland created a subdivision plan entitled, "Oak Bluffs," in which he laid out the property in small lots and curved avenues. He also designated eight areas on his plans as "parks." Each park was substantially larger than any of the numbered building lots, and several had curvilinear boundaries. The park parcels were spread throughout the subdivision. Vineyard historians claim that Oak Bluffs was the first planned residential community constructed in the United States, noting that it preceded Frederick Law Olmstead's "Riverside" in Chicago by three years.

Between 1866 and 1880, several other large parcels of land (approximately eight) contiguous to Wesleyan Grove and Oak Bluffs were laid out in subdivision plans and were marketed for sale to summer residents, including the Bellevue Heights subdivision in 1873. Each of these plans incorporated the important aspects of Copeland's design, including numbered building lots, and unnumbered parcels that were larger than the building lots and were labeled as parks or had a similar designation.

Apart from Luce's house in the Bellevue Heights subdivision, no other houses were built in the subdivision until 1910. The subdivision was not developed at the density originally planned (5,000 square foot lots). Many of the houses in the subdivision have been built on combined lots comprising one-quarter to one-half acre. Current zoning requires a minimum lot size of 20,000 square feet. The land involving the parks is currently vacant. Real estate bills were not issued for the parks' land until 1994, and no taxes have ever been paid on the parks.

After the individual defendants attempted to sell one of the parks, the plaintiffs commenced this action, seeking a declaration that the parks are subject to a "perpetual equitable servitude" in their favor, thereby precluding any residential construction, and seeking to enjoin the defendants from selling the parks for residential construction. The parties then filed cross motions for summary judgment and agreed to have the case considered as a case stated. The judge first noted that the plaintiffs could not assert a successful claim for an equitable

servitude because there was no written instrument satisfying the Statute of Frauds. The judge acknowledged that the plaintiffs had articulated rights to an implied easement in the parks, but concluded that they had not satisfied their burden of establishing any such easement. Judgment subsequently entered declaring that the parks are not burdened by any easement in the plaintiffs' favor.

1. The controlling principles of law are not in dispute. Because we have a decision on a case stated, "we deal with it anew, unaffected by any conclusions of law or inferences drawn by the judge in the Land Court." *Richardson* v. *Lee Realty Corp.*, 364 Mass. 632, 634 (1974). See *United States Fid. & Guar. Co.* v. *English Constr. Co.*, 303 Mass. 105, 108-109 (1939). "The origin of an implied easement 'whether by grant or by reservation . . . must be found in a presumed intention of the parties, to be gathered from the language of the instruments when read in the light of the circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or with which they are chargeable.' " *Labounty* v. *Vickers*, 352 Mass. 337, 344 (1967), quoting *Dale* v. *Bedal*, 305 Mass. 102, 103 (1940). "A plan referred to in a deed becomes a part of the contract so far as may be necessary to aid in the identification of the lots and to determine the rights intended to be conveyed." *Jackson* v. *Knott*, 418 Mass. 704, 711 (1994), quoting *Labounty* v. *Vickers, supra.* Further, "[i]t is well established that 'where land is conveyed with reference to a plan, an easement . . . is created only if clearly so intended by the parties to the deed.' " *Jackson* v. *Knott, supra* at 712, quoting *Scagel* v. *Jones*, 355 Mass. 208, 211 (1969). The burden of proving the existence of an implied easement is on the party asserting it. *Mt. Holyoke Realty Corp.* v. *Holyoke Realty Corp.*, 284 Mass. 100, 105 (1933).

2. Based on the deeds, the plan, and the circumstances attendant to, and following, the establishment of the Bellevue Height subdivision, the plaintiffs satisfied their burden of proving that an implied easement was intended with respect to the parks.

As previously noted, the plaintiffs' deeds all make reference to the plan. While the judge recognized that the plan raises an

inference that Luce intended to grant rights in the parks to his grantees, she did not look beyond the reference to the plan in the deeds to the details of the actual plan. The method of the exhibition of the parks on the plan has significance. See *Bacon* v. *Onset Bay Grove Ass'n*, 241 Mass. 417, 423-424 (1922). In contrast to the small, rectangular-shaped, numbered buildable lots, the plan expressly designated the parks as such (parks or plaza), left them unnumbered, and laid them out in irregular dimensions. The parks are dispersed throughout the subdivision to permit ease of access and use to all lot owners. The judge noted that the layout of Marginal Street (which surrounds and abuts the north, east, and west portions of Crystal Lake) made Crystal Lake "theoretically accessible" to all lot owners. However, without the use of the parks, the majority of lot owners would not be able to enjoy the social and recreational pleasures to be had by Crystal Lake. Only a small number of lots are bounded by Marginal Street and, without the parks, there is insufficient land (only the street) providing access to and permitting enjoyment of the lake. Further, unlike the situation presented in *Light* v. *Goddard*, 11 Allen 5, 8 (1865), Luce had no need to reference the plan in order to "designate with accuracy the [lots] intended to be conveyed."

We place little weight on the failure of Luce to specifically mention the word "parks" in the Vineyard Gazette advertisement. We acknowledge that other subdivisions in the area were advertised as specifically providing such amenities. It is entirely reasonable, however, given the context of the development of these other subdivisions in proximity to the Bellevue Heights subdivision, to infer that the existence of the parks was an important feature in Luce's attempt to sell the lots. See *Bacon* v. *Onset Bay Grove Ass'n, supra* at 423 (explaining that conditions existing at time when deed was made must be considered). These subdivisions were all seaside vacation resorts, designed essentially as communities, with small lots on which individuals and individual families could lodge, and with related parks and plazas on which the entire subdivision community could congregate for social, recreational, and religious purposes. See *id.* ("the divisions of large tracts into small lots, and the promotion of sales by schemes which

affect the use of the land by a neighborhood or community rather than by individuals as such, the necessity, which formerly was not so urgent, for open spaces and parks, the needs of a community designed largely for rest and recreation in vacations, and the fact that the general scheme of development was into lots of small size, all may be considered"). Without the parks, it is likely that the lots in Luce's subdivision would not have been competitive with those in nearby subdivisions. Cf. *Attorney Gen.* v. *Onset Bay Grove Ass'n*, 221 Mass. 342, 347 (1915) ("If the parks . . . are built over, it is obvious that contiguous estates will be greatly impaired in value and the community itself will suffer from the taking away of conditions of light, air, prospect and recreation, essential to its attractiveness as a shore resort as well as to its future residential growth"); *Attorney Gen.* v. *Abbott*, 154 Mass. 323, 326 (1891) ("If the corporation had announced, at the time of making the sales, that it reserved the right to cut up the open spaces into building lots, and to sell them after the village should be established, it would no doubt have diminished the sales").

Luce's advertisement did not specifically mention parks. The advertisement did, however, state that the Bellevue Heights subdivision was a "Seaside Resort," with "gently undulating" lands, and also quoted poetry describing "pleasure in the pathless woods." With small lot sizes, the advertisement's references to lands and woods, accompanied by poetic embellishment, suggested the existence of parks for the enjoyment of all lot owners. Further, the advertisement referred to "[l]ithographic plans" of the Bellevue Heights subdivision. By stating that "it is not clear whether the reference is to the 1872 Plan which depicts [the parks], or to another plan not in evidence," the judge did not give proper account to the fact that every *purchaser* of a lot in the Bellevue Heights subdivision is presumed to have reviewed the 1872 plan (which had been recorded) because it was referenced in the deed to his or her lot. See *Boston Water Power Co.* v. *Boston*, 127 Mass. 374, 376 (1879). There is nothing to suggest that any other plan was actually used to show prospective purchasers, or that any other plan did not lay out the parks as depicted in the 1872 plan.

Our conclusion is not predicated solely on the plaintiffs'

deeds, the plan, and the circumstances under which the lots were sold. We also find it significant that, just two years after marketing the Bellevue Heights subdivision and selling individual lots for amounts ranging approximately between $119 and $291, Luce's bankruptcy trustees sold the parks and avenues for five dollars. This conveyance demonstrates not only that the parks and avenues were of little market worth as developable land,[9] but also that Luce had intended to treat, and did so treat, the park lands as separate and distinct from the buildable lots. In addition, the parks were not assessed for tax purposes until 1994, and have remained vacant since their inception (which partly may be attributed to uncertainties in title). See *Bacon* v. *Onset Bay Grove Ass'n, supra* at 423 (in determining existence of implied easement, subsequent use of land may be considered). Cf. *Attorney Gen.* v. *Onset Bay Grove Ass'n, supra* at 349 (noting, in connection with dedication of park to public, absence of assessment); *Attorney Gen.* v. *Abbott, supra* at 327 (noting that, in connection with dedication of park to public, absence of adornment is of little consequence).

We conclude that Luce intended to create implied easement rights to the parks for land owners, such as the plaintiffs, within the Bellevue Heights subdivision.

3. We deal briefly with the remaining issues.

(a) The individual defendants argue that we should affirm the judgment because there is no fair or practical way to enforce any easement. This contention is not sufficient to overcome the easement. See *Carroll* v. *Hinchley,* 316 Mass. 724, 726, 730 (1944). Cf. *Attorney Gen.* v. *Abbott, supra* at 328-329.

(b) We reject the individual defendants' characterization of the plaintiffs' claimed interest in the parks as a restrictive

---

[9]The record discloses one deed to the plaintiffs' predecessors in interest that shows a conveyance of thirteen lots for "One Dollar and other valuable considerations." There is no evidence demonstrating the value of the "other valuable considerations." We reject the individual defendants' contention that we cannot infer anything from the bankruptcy trustees' conveyance because the plaintiffs did not present such an argument below. We are "at liberty to draw from the facts and documents stated in the case and inferences of fact that might have been drawn therefrom." *New England Found. Co.* v. *American Mut. Liab. Ins. Co.,* 358 Mass. 157, 158-159 (1970), quoting G. L. c. 231, § 126 (since repealed).

covenant that lapsed in 1964 because the plaintiffs and their predecessors failed to file a notice of restriction pursuant to G. L. c. 184, §§ 26[10] and 28.[11] The plaintiffs are asserting a right *to use* the land on which the parks are situated for general recreational purposes consistent with parks. The plaintiffs' interest is more accurately characterized as an affirmative easement, which is not subject to the notice of restriction provisions in the cited statutory provisions. See *Labounty* v. *Vickers*, 352 Mass. 337, 347-348 (1967).

(c) The individual defendants point out that they owe approximately $220,000 in back taxes and claim it would be "unfair and inequitable to impose all the burdens of ownership" on them, with all benefits accruing to the plaintiffs. The town, however, has stated that, in the event that an implied easement is created, "then the Town will forego the right to collect in excess of $200,000 in back taxes as well as future revenues." In view of the town's express representation, there is no reason to change our conclusion based on a claim of tax hardship.

4. The judgment is vacated. The case is remanded to the Land Court for further proceedings consistent with this opinion and for the entry of a new judgment containing a declaration that the parks are burdened by an implied easement in favor of the plaintiffs (with the exception of East Chop, see note 4, *supra*).

*So ordered.*

---

[10]General Laws c. 184, § 26, provides, in pertinent part:

"All restrictions on the use of land or construction thereon which run with the land subject thereto and are imposed by covenant, agreement, or otherwise, whether or not stated in the form of a condition, in any deed, will or other instrument executed by or on behalf of the owner of the land or in any order of taking shall be subject to this section and [§§ 27-30] . . . ."

[11]General Laws c. 184, § 28, provides, in pertinent part:

"No restriction imposed before January [1, 1962,] shall be enforceable after the expiration of fifty years from its imposition unless a notice of restriction is recorded before the expiration of such fifty years or before January [1, 1964], whichever is later . . . ."