NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11603

BRIAN S. HICKEY & others[1]  vs.  PATHWAYS ASSOCIATION, INC., & others.[2]


Suffolk.     October 7, 2014. - September 22, 2015.

Present:  Gants, C.J., Spina, Botsford, Duffly, Lenk, & Hines, JJ.


Beach.  Way, Private.  Real Property, Registered land: Easement, Beach, Easement.  Easement.

---

[1] Mary P. Hickey, Lorraine M. Paglia, and Robert L. Paglia.

[2] Kathleen D. Homa, Theodore M. Homa, Evelyn A. Jenkins, Jane W. Loiselle, John R. Loiselle, James T. Moshier, Mary E. Moshier, Joseph J. Rahal, Mary G. Rahal, Irving A. Wilson, Martha K. Young, Roland W. Young, Norman Allentoff, Patricia M. Becker, Robert Becker, Rebecca S. Blair, Wesley K. Blair, III, Carole R. Bohn, Geraldine Burstein, Joseph Burstein, Frank Carrick, Jean Carrick, Marie C. Creonte, William T. Creonte, Craig P. Eddy, Julia H. Eddy, Robert A. Furman, Elaine Giberti, Richard Giberti, Susan M. Hennessey, Pamela A. Maher, Paul J. Maher, Barbara Jessel, Martin Jessel, Karen LaFauci, James Maguire, Mary Maguire, Geoffrey L. Mahon, Mary Ellen Manock, Arthur Maressa, Gary McWilliams, Rosalind Neuman, Sanford Neuman, Marcia O'Shea, Richard O'Shea, Julie A. Piantedosi, Lewis R. Piantedosi, Paul W. Pietro, Susan E. Pietro, Joseph Russo, Suzanne Russo, Ronald S. Saks, Sharalyn Saks, Ann Christine Tobey, William Banks Tobey, Joseph Tosh, Christine M. Tosti, Christopher P. Tosti, Dorothy L. Tosti, Andrew Tvirbutas, Catherine Tvirbutas, Elizabeth Walker, John J. Walker, Kristin M. Walker, Michelle T. Walker, Susan L. Walker, Dudley Woodward, Karen Woodward, and Bayview Limited Partnership.

Civil action commenced in the Land Court Department on April 15, 2009.

The case was heard by Karyn F. Scheier, J., on a case stated.

The Supreme Judicial Court granted an application for direct appellate review.

Jennifer S.D. Roberts for Lorraine M. Paglia & another.
Brian M. Hurley for Brian S. Hickey & another.
Kevin T. Smith for Elizabeth J. Walker & others.
David L. Delaney for Pamela A. Maher & others.
Roland W. Young, pro se.
Peter L. Freeman, for William J. Creonte & others, was present but did not argue.

LENK, J.  This case involves a dispute among landowners in the same subdivision over access rights over a private way to the beach.  The plaintiffs own two beachfront lots in the town of Dennis (town), fronting on Shore Drive.  Shore Drive runs along the waterfront parallel to Cape Cod Bay.  The plaintiffs' lots are separated by a twenty-foot way that extends south from Cape Cod Bay, along the length of the lots, to Shore Drive.  The defendants[3] own lots located to the south and west of the

---

[3] A number of the defendants in the Land Court did not pursue an appeal.  Another seven defendants, who own waterfront lots that appear on the subdivision plans showing the plaintiffs' lots (James J. Lepore, Douglas and Patricia Suliman, N. Richard and Karen Greenfield, and Jack and Claire Chaflin), filed a joint stipulation of dismissal in December, 2010, several years before the Land Court judge issued her decision. For simplicity, we refer to the set of defendants who pursued an appeal as "the defendants."

plaintiffs' lots, starting from the inland side of Shore Drive. All of the land involved is registered land; it had formed part of a 217.24 acre tract of land originally owned by Frank B. Tobey and registered in the Land Court in 1903. In 1917, Tobey conveyed the parcel to two sisters who thereafter subdivided the parcel repeatedly through 1977. Over that sixty-year period, they subdivided the parcel a small section of residential lots at a time. The way appears on the subdivision plans creating the plaintiffs' lots, and on some of the plans creating the defendants' lots.

The defendants maintain that, according to provisions in their deeds and certificates of title, all of which reference easements over ways in subdivision plans, they hold rights of access over the way. The plaintiffs contend that they hold all ownership rights in the way, and the defendants have no right to use it for any purpose. The plaintiffs claim that, once the sisters sold the second of their two lots to the plaintiffs' predecessors in interest, the way as it appears on the subdivision plans ceased to exist, with each of their predecessors in interest acquiring title to one-half of the way, and no one else retaining any rights of access. In support of this contention, the plaintiffs offer a series of arguments, some of which are contradictory to others.

If the land at issue here were recorded land, it is

unlikely that this case would be before us. Under long-standing common-law rules of interpretation of deeds containing references to plans, the defendants' understanding likely would prevail. However, this is registered land. And the land registration act provides that "[e]very plaintiff receiving a certificate of title in pursuance of a judgment of registration, and every subsequent purchaser of registered land taking a certificate of title for value and in good faith, shall hold the same free from all encumbrances except those noted" on the certificate. G. L. c. 185, § 46. While the plaintiffs' deeds contain provisions granting easement rights over the way from the original developers to the plaintiffs' predecessors in interest, it is undisputed that the plaintiffs' certificates of title do not contain a specific encumbrance showing an easement right held by any one of the named defendants. Therefore, we confront the question whether easements claimed over registered land to provide waterfront access from the defendants' inland lots are binding against the plaintiffs, where easements benefiting the defendants do not appear on the plaintiffs' certificates of title, but are noted in various forms on the defendant lot owners' certificates of title and in plans referenced in those certificates.

The plaintiffs filed an action in the Land Court to quiet title and for declaratory relief against twenty named defendants

and persons "unascertained or unknown claiming as successors of Frank B. Tobey." Ultimately, the case proceeded with almost seventy named lot holder defendants holding thirty-eight certificates of title. Relying on a common-law presumption, the judge determined that the plaintiffs hold the fee in the way, each abutter owning the land from the lot line to the center line of the way.

In evaluating the defendants' claims to easements over the way, the judge divided the defendants into three main groups. The division was based on differences in the language in the defendants' certificates of title concerning access over ways shown on different subdivision plans. The first group of defendants holds certificates granting them access over the ways shown in "all other plans in Land Court Case No. 647," the original Land Court case under which the 217 acre parcel was registered in 1903. The second group of defendants holds certificates of title granting them access over all ways shown on Land Court Plan 647-G (G Plan); that plan, which also shows the earlier subdivision plans establishing the plaintiffs' lots and the way, created thirty-two lots, moving several blocks inland from the plaintiffs' lots. The third group of defendants holds certificates of title referencing ways appearing on subdivision plans, other than the G Plan, that show their particular lots. Many of those defendants' certificates

reference Land Court Plan 647-M (M Plan), which created approximately eighty lots south and southwest of the lots on the G Plan. Other of those defendants' certificates reference later plans showing small sections of lots created by reconfiguring a series of lots on a given street shown on the G or M Plans, without changing any of the public or private ways shown on the G or M Plans. The judge concluded that the lot owners in the first and second groups hold rights of access over the way, and the owners in the third group do not.

The plaintiffs appealed, and a number of the defendants filed cross appeals. Thereafter, we allowed the plaintiffs' application for direct appellate review. Because the defendants successfully rebutted the common-law presumption, we determine that the plaintiffs do not hold the fee in the way. We conclude also that, as to the first two groups of defendants, the judge was correct in determining that the defendants hold easements over the way. We conclude further that, as to the third group of defendants, and all but two of the unclassified defendants,[4]

---

[4] Certain defendants were not classified into any of the three groups. For varying reasons, the judge concluded that certain of those unclassified defendants hold access rights over the way, and eleven do not. We conclude that the judge was correct in deciding that two of those defendants, Rosalind and Stanford Neuman, whose names do not appear on any certificate of title submitted to the Land Court, do not hold easements over the way. As to the other defendants, who hold Certificates No. 190691 (Walker), 110223 (Maressa), 164891 (Tosti), and 179868 (Tobey), we conclude that they hold easement rights over the way

they, too, hold easements for access to the waterfront over the way.

1. Background. The Land Court judge reached her determination on a "case stated" basis, relying upon facts stipulated by all of the parties and 285 exhibits, largely copies of documents filed in the Barnstable Registry District of the Land Court. After she issued her initial decision in April, 2013, the judge allowed the parties to submit proposed corrections of stipulated facts and other requested modifications. In July, 2013, the judge issued an amended final decision, allowed a motion for entry of judgment, and modified a preliminary injunction prohibiting access to the way, entered at the request of the plaintiffs in June, 2010, such that the successful defendants were permitted to use the way. We summarize the undisputed facts, reserving certain facts for later discussion of the issues.

a. Development of the registered parcel. The plaintiffs, Brian S. Hickey, Mary P. Hickey, Robert L. Paglia, and Lorraine M. Paglia, own two beachfront lots in the town, Lots X and J respectively. The lots, fronting on Shore Drive, are separated by a twenty-foot way that extends south from Cape Cod Bay, along the approximately 280 foot length of the plaintiffs' lots, and

for reasons similar to those for the owners in the second and third groups. See discussion, infra.

ends at Shore Drive. The defendant lot owners hold thirty-eight certificates of title to lots inland of the plaintiffs' lots, on the inland side of Shore Drive, south of the plaintiffs' lots. All of the lots involved initially formed part of a 217.24 acre tract of land owned by Frank B. Tobey. In 1903, Tobey brought a proceeding in the Land Court, Registration Case No. 647, to register the parcel pursuant to G. L. c. 185. He was issued certificate of title No. 16, under plan 647-A.

The registered parcel was first subdivided in June, 1917, when it was conveyed to the original developers, sisters Lunette Luscombe and Ruth T. Morley, under Plan 647-B (B Plan). The B Plan subdivided the easternmost part of the 217 acre parcel, bounded on the north by Cape Cod Bay and on the west by a "road" now known as Nobscussett Road, into 155 lots.[5] In 1925, Luscombe and Morley conveyed the land to the Nobscussett Realty Trust (their family trust) and, in 1928, conveyed another subdivision

---

[5] The B Plan is divided into two sheets. The first sheet creates a series of waterfront lots along a street paralleling Cape Cod Bay, with four ten-foot ways extending between every three waterfront lots, from the road to the beach. A strip of beach, approximately 150 feet wide, runs along the waterfront the entire length of the plan, and is itself labeled as a lot. South of the waterfront road, the plan creates two more parallel streets running east-west, with several connecting streets running north-south from the waterfront road. The second sheet creates an additional eight blocks of residential lots, further inland from the lots on the first sheet, with north-south streets connecting to the streets shown on the first sheet, and extending inland to the boundary of the developers' land.

of the 217 acre parcel, the C Plan.[6]

In June, 1935, the entire 217 acre parcel was reconveyed to Luscombe and Morley, who were issued Certificate of Title No. 3710 (Certificate No. 3710). After they reacquired the registered parcel, Luscombe and Morley began developing residential lots to the west of Nobscussett Road, in a similar fashion to the earlier subdivision on the B Plan. Luscombe and Morley proceeded first to develop lots along the shore line from east to west, and then from the south side of Shore Drive inland.

The plaintiffs' lots were created on subdivision plans 647-D (D Plan) and 647-F (F Plan), in 1936 and 1938. These plans show five and thirteen residential lots, respectively, along Cape Cod Bay to the north of a road now known as Shore Drive. The twenty-foot way at issue first appeared on the D Plan. It is shown on the western side of the D Plan, and abuts the western boundary of the lot that is now the Paglias'. Shore Drive (labeled "Road") is shown extending open-ended on the western edge of the D Plan.[7] The eastern boundary of the

---

[6] The C Plan is essentially a square running south from Cape Cod Bay, immediately to the west of Nobscussett Road, encompassing much of the land at issue here, including the land on the D, F, and G Plans.

[7] On the eastern side of the D Plan, a perpendicular road, also now known as Shore Drive, extends north to the shoreline, along the eastern edge of the easternmost lot, and extends south

easternmost lot on the F Plan, now the Hickeys' lot, abuts the way to the west of the Paglias' lot.[8]  The defendants' lots, south of Shore Drive, were created on subdivision plans 647-G, 647-M, 647-S, 647-2, 647-8, 647-11, and 647-15, from 1940 through 1977.[9]

When the plaintiffs acquired their lots in 1994 and 1999, a large wooden staircase standing at the waterfront end of the

---

to a road owned by the town of Dennis (town).  At that time, Luscombe and Morley also owned all of the land between Shore Drive and the town road.

[8] In 1937, between the filing of the D and F plans, Luscombe and Morley filed the E Plan, which subdivided the westernmost part of their 217 acre parcel, a portion that jutted west along the waterfront; unlike the land south of the D and F Plans, Luscombe and Morley did not own the land south of the land on the E Plan.  The E Plan created one large waterfront lot, Lot K, two smaller inland lots, Lots L and M, immediately south of Lot K, and a road now known as BayView Road leading southeast from Lot K, between lots L and M, and thence along the western edge of the developers' parcel.  In May, 1937, the town took Bayview Road by an exercise of eminent domain.  Approximately one month later, Luscombe and Morley conveyed Lot K to the town; it became a public beach, with public parking added later on Lots L and M. In 1945, the town took the Common Landing parcel, a waterfront parcel at the northern terminus of Shore Drive, and took an easement in Shore Drive from that point west to Bayview Road. All of these takings, which provided public access to the waterfront at the westernmost and midway points of the original parcel, occurred before Luscombe and Morley conveyed any lots to the defendants' predecessors in interest.

[9] For convenience, an overlay combining the individual Land Court plans into a single document is attached in the Appendix. It is similar to a map prepared by some of the parties during proceedings in the Land Court, and submitted in the record appendices in their briefs, that was not an exhibit in the summary judgment record.

area of the way led from the dunes and rocks down to the beach. For some years, the plaintiffs saw the way being used, but took no action; the Hickeys maintained in argument before us that they allowed this use as permissive. Several years before commencing litigation in the Land Court, however, the plaintiffs decided that they no longer wanted this use to continue; eventually, contending that the staircase was dangerous because of damage to some of the supporting posts, the Paglias obtained permission from the town to remove it. The Land Court judge's order explicitly permitted those defendants whom she concluded had access rights over the way to repair or rebuild the staircase and to make use of the way.[10]

b. Judge's classification of defendant lot holders. As stated, the judge divided most of the defendants into three groups, based on language in their certificates of title. The first group of owners (fourteen certificates of title) hold certificates of title and deeds that state, either directly or by incorporating a reference to an earlier certificate or deed, that the owners "have, as appurtenant to said parcel, a right to use all ways shown on all other plans filed in Land Court Case No. 647, for all purposes in common with others entitled

---

[10] An easement on registered land cannot be extinguished through nonuse or prescription. See G. L. c. 185, § 53; Cater v. Bednarek, 462 Mass. 523, 528-529 & n.15 (2012); Lasell College v. Leonard, 32 Mass. App. Ct. 383, 390 (1992).

thereto." The second group of owners (seven certificates of title) have certificates of title and deeds explicitly granting access to all ways shown on the G Plan.[11]

The third group of owners hold eleven certificates of title to lots shown on derivatives of the G Plan, and to lots shown on the M Plan and plans reconfiguring specific lots on that plan. Their certificates of title reference rights to ways appearing on subdivision plans showing their particular lots; the certificates do not explicitly reference the G Plan or explicitly grant rights to use all of the plans in Case No. 647. The certificates state, either directly or by incorporating a reference to an earlier certificate or deed, that "there is appurtenant to [the lot] a right to use the ways shown on [the plan showing the lot] for all purposes common with others entitled thereto."

2. Discussion. The plaintiffs maintain that the judge erred in concluding that any party other than the plaintiffs themselves has rights to use the way. They argue that the judge determined correctly that, under common-law principles

---

[11] The G Plan, which creates lots south and east of the plaintiffs' lots, including those immediately across the street, on the inland side of Shore Drive, also shows the way, the lots on the D Plan, and the eastern half of the lots on the F Plan, including the Hickeys' lot, as well as another way to the water between two other waterfront lots on the F Plan. The G Plan also indicates the outlines of the B Plan, the subdivision to the east of Nobscussett Road.

applicable to land conveyed as abutting a way, the plaintiffs own the fee from their respective lot lines to the center of the way. Based on this, the plaintiffs contend that, after deeding the parcels containing what are now the Hickey and Paglia lots to the plaintiffs' predecessors in interest, Donald B. Aldrich and Eugene J. and Harriet J. Waldron, respectively, the developers Luscombe and Morley retained no rights to grant easements to subsequent purchasers of any other lot. The plaintiffs argue also that, even if Luscombe and Morley retained some interest in the way, the judge improperly determined that the defendants are entitled to easements by estoppel, which the plaintiffs contend are prohibited under Jackson v. Knott, 418 Mass. 704, 711 (1994) (Jackson).[12] The plaintiffs maintain further that Lane v. Zoning Bd. of Appeals of Falmouth, 65 Mass. App. Ct. 434 (2006) (Lane), and Duddy v. Mankewich, 75 Mass. App. Ct. 62 (2009) (Duddy), upon which the judge relied, were wrongly decided, and are contrary to Jackson, supra at 714 n.7, and to G. L. c. 185. Finally, the plaintiffs argue that the facts here differ significantly from those in Lane and Duddy, and that, applying their holdings, which the plaintiffs maintain are that easements by estoppel may arise on registered land, no

_____

[12] In addition, the Paglias argue explicitly, and the Hickeys suggest, that the exceptions noted in Jackson v. Knott, 418 Mass. 704, 711 (1994) (Jackson), are improper, and that easements on registered land should be construed strictly to include only those entries on the certificate of title.

easements exist over the way for the benefit of any of the defendants.

Because the judge issued her decision on a case stated basis, we review it de novo, drawing our own inferences of fact and reaching our own conclusions of law.  See Richardson v. Lee Realty Corp., 364 Mass. 632, 634 (1974); Ware v. Hardwick, 67 Mass. App. Ct. 325, 326 (2006).

Having considered the defendants' arguments in rebuttal of the common-law presumption, we conclude that the defendants have established the original developers' intent to retain the fee in the way, and that the plaintiffs hold only easements over the way.  We conclude also, following Jackson, Lane, and Duddy, that documents on file in the land registration office show Luscombe and Morley's clear intent to grant easements over the way to the defendants in both the first and second groups, and, based on similar reasoning, to the defendants in the third group.

a.  Fee in the way.  We consider first a question that the plaintiffs argue is outcome determinative:  the ownership of the fee interest in the way.  The plaintiffs maintain that once Luscombe and Morley conveyed their lots out of the registered parcel to Aldrich and the Waldrons, Luscombe and Morley had no rights left in the way to convey to future purchasers of any other lots, see Darman v. Dunderdale, 362 Mass. 633, 639 (1972), and thus that any language purporting to grant easements in any

of the defendants' certificates of title could not have conveyed such an interest. The defendants joining one of the briefs argue that the plaintiffs hold fee in the way, but that Luscombe and Morley retained an easement interest which they were able to convey. A majority of the defendants maintain, however, that the plaintiffs hold only easement rights in the way, in which Luscombe and Morley retained the fee interest. See Suburban Land Co. v. Billerica, 314 Mass. 184, 189-190 (1943).

The judge determined that the Hickeys and the Paglias each own a fee in one-half of the way based on the common-law presumption[13] that a grantor conveying land described as "on" or "by" a way, who owns title to the way, as here, is presumed to have conveyed the way to its center line.[14] See Rowley v. Massachusetts Elec. Co., 438 Mass. 798, 803 (2003); Murphy v. Mart Realty of Brockton, Inc., 348 Mass. 675, 679-681 (1965) (Murphy).

---

[13] Common-law principles apply here because the derelict fee statute, G. L. c. 185, § 58, enacted in 1971 and amended in 1990, does not apply retroactively to registered land. G. L. c. 185, § 2. See generally Hanson v. Cadwell Crossing, LLC, 66 Mass. App. Ct. 497, 499-502 (2006); Adams v. Planning Bd. of Westwood, 64 Mass. App. Ct. 383, 387-391 (2005).

[14] While the judge's decision states that the plaintiffs' ownership of the fee is a stipulated fact, most of the defendants did not stipulate to such ownership. Indeed, after the initial decision was issued, a number of the defendants challenged that assertion. In her order granting final judgment, the judge clarified that she relied on the common-law presumption, but did not further explain her reasoning.

Although the plaintiffs present it as a "rule of law" and state that fee ownership was conveyed to Aldrich and the Waldrons by "operation of law," the common-law presumption that a grantor of property abutting a way also conveys the fee to the center of the way is "not an absolute rule of law irrespective of manifest intention, but is merely a principle of interpretation adopted for the purpose of finding out the true meaning of the words used." Crocker v. Cotting, 166 Mass. 183, 185 (1896). "[A]fter reviewing the cases concerning this rule of presumed intent, the court [explained] that 'the underlying principle on which they all rest is that the intent of the parties in each instance was ascertained from the words used in the written instrument interpreted in the light of all the attendant facts. That is the general principle governing the interpretation of deeds.' Simonds v. Simonds, 199 Mass. 552, 554 (1908)." Suburban Land Co. v. Billerica, 314 Mass. at 189, quoting Erickson v. Ames, 264 Mass. 436, 444 (1928). See Patterson v. Paul, 448 Mass. 658, 665 (2007). If there is ambiguity in the deed concerning whether and to what extent an easement was intended, rather than a grant of the fee, a court may consider the circumstances existing at the time the deed was executed to assist in determining the grantor's intent. Queler v. Skowron, 438 Mass. 304, 311 (2002); Dunham v. Dodge, 235 Mass. 367, 371-373 (1920).

To determine whether the defendants have rebutted the presumption in this case requires a review of the progression of the development of the registered parcel and the creation of the plaintiffs' lots.

i. Paglias' lot. As stated, the Paglias' lot, Lot J, was created by a subdivision shown on the D Plan, filed in September, 1936, that created five beachfront lots. Lot J is bordered by Lot I to the east and by the way to the west. On September 4, 1936, Luscombe and Morley conveyed Lot J, and the other four lots shown on the D Plan, to Aldrich, the Paglias' predecessor in interest. The Aldrich deed described Lot J as being bounded by Cape Cod Bay to the north, "[w]esterly by a 20-foot right of way, there measuring two hundred eighty feet (280) feet . . . ; [s]outherly by a 40-foot road [Shore Drive] . . . and [e]asterly by 40-foot road [also known as Shore Drive]." Lot J was conveyed "together with rights of way for all purposes over said roads and rights of way." Aldrich's certificate of title states that the land "is subject to and has the benefit of the easements, restrictions and rights set forth in Document No. 8841 [the Aldrich deed] and Certificate No. 3710 [the Luscombe and Morley certificate] so far as the same are in force and applicable." The Paglias acquired Lot J by deed dated August 30, 1999. The Paglias' certificate describes the land as "Lot J Land Court Plan 647-D."

ii.  Hickeys' lot.  The Hickeys' lot, Lot X, was created in July, 1938, by a subdivision shown on the F Plan.  The F Plan created thirteen beachfront lots.  Lot X is bordered on the east by the way and on the west by Lot Y.  The Paglias' lot, Lot J, also appears on the F Plan, to the east of Lot X; Lots X and J are shown on the F Plan as separated from each other by the way. Two other ways to the water, virtually identical to the way at issue, also appear on the F Plan, between lots N and O and between Lots Q and R.  In 1944, Luscombe and Morley conveyed lots X and Y to the Waldrons, the Hickeys' predecessors in interest.  The Waldron deed describes the parcel as bounded northwesterly by Cape Cod Bay, on the northeast by "a way 20 feet wide [and] 275 feet . . . ," southeasterly by another way [Shore Drive], and southwesterly by Lot Z.  The Waldrons' certificate of title provides that both Lots X and Y have an appurtenant "[r]ight of [w]ay over the adjacent ways as shown on plan 647-F" and that the land "is subject to and has the benefit of the rights and provisions in Certificate of Title No. 3710, so far as the same are in force and applicable."  The Hickeys acquired lot X by deed dated May 14, 1994.  The Hickeys' certificate of title describes their land as Lot X in Plan 647-F and provides:

> "Said land is subject to and has the benefit of the rights and provisions in Certificate of Title No. 3710, so far as in force and applicable.

"There is appurtenant to said land a right of way over the adjacent ways as shown on said plan 647-F."

iii. <u>Defendants' lots</u>. Lots held by sixteen of the defendants[15] were created on the G Plan, filed in May, 1940. The majority of the lots of the defendants in the first and second groups appear on that plan. Another nine of the defendants' lots were created on the M Plan, filed in June, 1947.[16] Many of the lot of the owners in the third group appear on that plan. The remaining lots held by the defendants were created by plans that reconfigured specific lots along individual streets on the G and M Plans.[17]

---

[15] Roland W. and Martha K. Young (Lot 236), Lewis R. and Julie A. Piantedosi (Lot 237), Craig P. and Julia H. Eddy (Lot 238), Dudley and Karen Woodward (Lot 242), William T. and Marie C. Creonte (Lot 244), Frank and Jean Carrick (Lots 245 and 246), James and Mary Maguire (Lots 257 and 258), and Jane and John Loiselle (Lot 259).

[16] Theodore M. and Kathleen D. Homa (Lot 323), Ronald S. and Sharalyn Saks (Lot 324), Joseph and Dorothy L. Tosti (Lot 337), Robert and Patricia M. Becker (Lot 368), and Karen LaFauci (Lot 387).

[17] Plan 647-S (October, 1955), created Lot 522, owned by defendants Paul W. and Susan E. Pietro.

Plan 647-2 (August, 1964) reconfigured certain lots on the M plan. It shows lots owned by Wesley K. and Rebecca S. Blair (Lot 465), Ann Christine Tobey, William Banks Tobey, and Mary Ellen Manock (all having a one-third interest in Lots 466 and 467), Joseph and Geraldine Burnstein (as having a partnership interest in partnership holding Lot 471), James T. and Mary E. Moshier (Lot 476), Norman Allentoff (Lot 478), Joseph and Suzanne Russo (Lot 479), Richard and Elaine Giberti (Lot 488),

iv. <u>Interest in the way reserved by grantors Luscombe and Morley</u>. The reason for the rule of presumed intent has been said to be that it is not to be presumed that a grantor, having conveyed lots bounding on a street "under which the land presumably would be of little value to a private owner, would not be expected to care much to retain the title after parting with all of his property on the side of the street." <u>Gray</u> v. <u>Kelley</u>, 194 Mass. 533, 537 (1907). See <u>Erickson</u> v. <u>Ames</u>, 264 Mass. 436, 443 (1928).

In <u>Suburban Land Co</u>. v. <u>Billerica</u>, 314 Mass. at 189, we examined certain deeds in a subdivision to determine whether the developer had intended to convey the fee in particular ways to lot holders whose lots abutted the ways, where the deeds were silent on the question of fee ownership. The town argued that

---

and Joseph J. and Mary G. Rahal (Lot 491).

Plan 647-8 (July, 1969) reconfigured other lots shown on the M plan and created lots owned by defendants Christopher P. and Christine M. Tosti (Lot 515), Richard and Marcia O'Shea (Lot 518), Martin and Barbara Jessel (Lot 523), Robert A. Furman and Carole R. Bohn (Lot 525), and Gary McWilliams (Lot 527).

Plan 647-11 (May, 1973) reconfigured certain lots shown on the G Plan and created lots owned by Paul J. and Pamela A. Maher (Lots 533 and 534), Susan M. Hennessey (Lot 535), Andrew and Catherine Tvirbutas (Lot 538), and Geoffrey L. Mahon (Lots 539 and 540).

Plan 647-15 (August, 1977) reconfigured another group of lots shown on the G Plan, creating lots owned by defendants John J., Elizabeth, Kristin M., Susan L., and Michelle T. Walker (Lot 569), and Arthur Maressa (Lot 571).

the developer had had no interest to convey at the time it purported to convey an easement to a water company to install and maintain a water system, which the successor in interest to the water company later obtained via a foreclosure deed. Id. at 188. We determined that the presumption that the developer conveyed the fee to the abutting landowners had been rebutted because the developer had installed and operated a system of water pipes beneath the ways at the time of the conveyances of the lots. Id. at 190. We concluded that the developer would not have conveyed the ways to the abutting lot holders because the developer "could not have intended to hamper itself and its rights by parting with the fee in any part of these streets." Id. We therefore reversed a decision by the Superior Court that a successor in interest of the developer had no easement in the ways. Id. at 194.

Here, likewise, there is clear indication in documents on file with the land registration office that Luscombe and Morley did not intend to convey the fee in the way. Rather, they reserved it for themselves to further their plan of development of the subdivision. This intent is evident in the language of the deeds, in the ways laid out on the plans and the plain interrelationship among the plans, in other documents in the land registration system indicating the conduct of Luscombe and Morley and their grantees throughout the forty-year period of

development of the 217 acre parcel,[18] as well as in Luscombe and Morley's winding up of ownership interests in the ways after the subdivision of the parcel was completed.

When the way was created and the first deeds out were conveyed to Aldrich and the Waldrons, the way is described as adjacent to or "appurtenant to" their lots, separate and distinct from the lots themselves.  In both deeds, Luscombe and Morley explicitly granted Aldrich and the Waldrons easement rights in the way.  Clearly treating the way as separate property, Aldrich's deed and certificate of title provide that Lot J is conveyed "together with the rights of way for all purposes over said roads and rights of way [on the D Plan]."[19] The Waldron certificate of title provides, "There is appurtenant to said lots a [r]ight of [w]ay over the adjacent ways as shown

_____

[18] The entirety of the 217 acre parcel, shown on plans A, B, and C, is included in Luscombe and Morley's certificate of title, Certificate No. 3710.  The certificate provides, in part:

> "Said land is subject to and has the benefit of all outstanding rights of way, if any such there be, and so far as the same are now in force and applicable."

[19] In addition to the way, the D plan shows a road that is now Shore Drive, running east-west parallel to the coast; another road also now called Shore Drive, running north-south along the eastern boundary of Lot F, the easternmost lot, and intersecting with the waterfront road; and, finally, a town road parallel to the water, further inland, separated from the rest of the plan by a large section of undeveloped land then owned by Luscombe and Morley.  On the D Plan's eastern boundary, a reference states, "See Plan No. 646-G, Cert. of Title No. 1689."

on said plan 647-F."[20]  Had Aldrich and the Waldrons held the fee in the way, such easement rights over the way would have been of no use.  Indeed, the conveyance of such an easement would have been of no effect; the holder of a fee cannot hold an easement for access over the fee.  Thus, upon conveyance of Lot X and the ten feet on the western half of the way to the Waldrons, the easement would have been extinguished.  See Goldstein v. Beal, 317 Mass. 750, 754 (1945) (Goldstein), and cases cited.  See also Adams v. Planning Bd. of Westwood, 64 Mass. App. Ct. 383, 390 n.15 (2005); Cheever v. Graves, 32 Mass. App. Ct. 601, 606 (1992).  The developers' intent to grant easements, not fees, is thus even more evident than for the developers in Suburban Land Co. v. Billerica, 314 Mass. at 190, where the deeds were silent as to fee or easement rights in the way.

An examination of the plans in Case No. 647 shows that the parcel is a long, narrow strip along the waterfront, extending approximately five blocks inland from the shoreline.  On all of the plans, to the east and west of Nobscusset Road, the land is divided into small residential lots, along ways roughly paralleling the water.  Ways running between waterfront lots,

---

[20] In addition to the way at issue, the F Plan shows two other ways leading between waterfront lots to the beach, and shows what is now Shore Drive abutting the southern boundary of all of the waterfront lots.  Shore Drive and Lot J are both depicted as open-ended; Shore Drive leads off the eastern edge of the F Plan into what is noted as the D Plan, "filed with Cert. of Title No. 4063."

from the water to a road along the shore, are shown every three to four house lots west of Nobscussett Road, on the D, F, G Plans, and to the east of Nobscussett Road, on the B Plan. See note 5, supra. The way to the waterfront would have been of no use to Aldrich, the owner of five waterfront lots, or to the Waldrons, owners of two waterfront lots; all of their lots are entirely on the waterfront, with lot lines continuing down to the mean high water mark. The way also would serve no purpose for any of the other waterfront lots shown on the D and F Plans, whose lot lines also continue to the mean high water mark. The way thus created, along with the two other ways between waterfront lots shown on the F Plan, are, on the face of the plans, part of an integral scheme of ways in a neighborhood, providing access to the waterfront, every three or four lots.[21] The purpose to provide waterfront access to inland lots is obvious on the face of the plans, and would have been to those purchasing the Paglia lot in 1936 and the Hickey lot in 1944.

Retaining the fee in the way provided Luscombe and Morley, who held property inland of the waterfront lots shown on the D and F Plans, rights to the waterfront which they could convey to

---

[21] The plans show this continuing pattern of development notwithstanding the public access available to the beach after the takings of Bayview Road to the west, Shore Drive, and Common Landing to the east, and after Luscombe and Morley had deeded beachfront Lot K, adjacent to Bayview Road, to the town as a public beach. See note 8, supra.

subsequently developed inland lots.  See Duddy, supra at 63, 64 (in conveying lots abutting way on first plan, developer was "careful to retain the fee" in that way, and thereafter conveyed easement rights over extension of way shown on subsequent plan to additional lots created on that plan).  That Luscombe and Morley contemplated such further development is clearly indicated in the reference to the as-then-yet-to-be-filed G Plan at the eastern side of the D Plan, and in the large section of undeveloped land they owned south of Shore Drive, that appears on the D Plan, bounded by a town road.  The landowners to whom Luscombe and Morley later conveyed lots were explicitly granted easements to use all ways shown on their plans, together with others, or all ways in the registered land case.  Clearly, for Luscombe and Morley, maximizing the value of the registered parcel rested in developing inland lots with convenient access to the water.  They would not have hampered themselves in this pursuit by conveying the entirety of the fee over the way to the first two purchasers.  See Suburban Land Co. v. Billerica, 314 Mass. at 190.  Like the developer in that case, the presumption of intent to convey a fee because the way would have had no remaining value to Luscombe and Morley after the lots abutting it were conveyed "is not applicable here, for the fee in the streets was a valuable adjunct to" Luscombe and Morley's other land.  Id.

In addition to the plain language of the Aldrich and Waldron deeds, and the clear purpose of the way, other documents in the registry system indicate an intention to convey easements and to reserve the fee. In 1939, after the conveyance to Aldrich, and before the conveyance to the Waldrons, Luscombe and Morley conveyed two other waterfront lots, Lots 233 and 234, the first lots out on the G Plan, to Joseph Pare, Jr. In 1939, again before the conveyance to the Waldrons, Luscombe and Morley conveyed two additional lots on the G Plan, lots 231 (waterfront, abutting the way on the eastern edge of the F Plan) and 232 (inland) to Joseph Pare, Jr., by a deed stating that the lots "are subject to and have the benefit of all outstanding [rights-of way], if any, in-so-far as the same are now of legal force and effect."

Throughout the course of development, Luscombe and Morley continued to grant explicit rights in all ways shown on a plan or to all ways in Case No. 647, indicating a belief that they had rights to do so; those rights were included on the lot owners' certificates of title. In similar circumstances of intended future development by owners of a large parcel, we noted that a potential purchaser

> "reasonably should have been aware that the [developers] would have to retain title to the proposed way in order to proceed with the development of the large area of land beyond their lot. The [developers] were both the owners and developers of the land and it would be contrary to

> common sense for [a plaintiff,] one of the original purchasers of lots north of the developed area, to believe that no other property was to be developed that would require the use of the 'proposed street' for access.  The right-of-way granted [to another lot holder], which was recorded before the date of the deed from the [developer] to [the plaintiffs], makes it clear that the ownership of the land within the 'proposed street' and extending beyond into the undeveloped part of the property was to remain with the [developers]."

Beattie v. Swanson, 360 Mass. 50, 53 (1971).  See Emery v. Crowley, 371 Mass. 489, 492-493, 494 (1976), quoting Murphy, supra at 680 (language of deed and plans showed that grantor did not intend to convey fee in way that crossed another parcel, but only easement of access to adjoining lot; "rules of construction are designed to elucidate the intent of parties to written instruments, . . . and thus look to the instruments themselves and extrinsic facts, if necessary, to decide if the deeds involved here pass title to real estate 'abutting' a 'way'"); McGovern v. McGovern, 77 Mass. App. Ct. 688, 700 (2010) ("the conduct of the parties after the conveyance was consistent with retention of the fee").  See also Frost v. Jacobs, 204 Mass 1, 5 (1910) (concluding grantors did not intend to convey fee in passageway where deed conveyed "privilege to the owner of said lot to use the private way in common with other abutting owners," retention of fee permitted grantor to grant access to way and staircase in subsequent sale, and grantee thereafter conveyed property using same language in subsequent deed).

Furthermore, the town acted as though Luscombe and Morley had retained the fees in the ways. When the town took Bayview Road in 1937, and the Common Landing at the end of Shore Drive in 1945,[22] and took an easement in Shore Drive itself,[23] also in 1945, the town listed in the instruments of taking the lot

---

[22] The Common Landing occupies the northernmost portion of Shore Drive, terminating in the water, between Lot J on the D Plan (then owned by Aldrich) and Lot 234 on the G Plan (then owned by Schweinler). Schweinler and Aldrich are listed in the instrument of taking as the abutting lot holders; the land in the way taken is described as "'Common Landing' at the northerly end of Shore Drive," "by the land of" Aldrich and "by the land of" Schweinler. Luscombe and Morley are listed as the owners of the land taken and are awarded damages.

[23] The length of Shore Drive from Bayview Road to Nobscussett Road is approximately 3,600 feet. At the time of the taking, there were thirteen lot owners, some of whom held multiple lots abutting Shore Drive, including Aldrich, the Waldrons, Pare, and Schweinler, and also Luscombe and Morley. All are noted in the document of taking. The document states that it takes "land within the side lines of the town way called Shore Drive." The land taken is detailed, for each lot owner, as abutting, inter alia, the "northerly," "easterly," "southerly," and "westerly" "side line" of the lot along Shore Drive.

The document of taking states that the town awards damages to Luscombe and Morley "as damages to the owners of the land for the taking of this easement." The land taken for which damages are paid is designated as 144,350 square feet of land, described in Certificate No. 3170. Dividing approximately 144,350 by the 40-foot width of Shore Drive, Luscombe and Morley were compensated for the entire approximately 3,600 length of Shore Drive west of Nobscussett Road, and the abutting lot owners were not compensated. Pare, the owner of Lot 231, was compensated for 300 square feet of land that would become an extension of Shore Drive. At the time of the taking, Shore Drive ended on the west side of Pare's land; the extension ran across his lot. Lot 231 was later subdivided into eighteen lots, some of which are held by defendants in this case.

owners abutting those ways, and then compensated Luscombe and Morley, stated to be the owners of the land in the ways that were taken, for those takings.

Additionally, in 1982, when winding up after all of the land had been subdivided and conveyed, Luscombe and Morley deeded the ways in the subdivision first to the Nobscussett Realty Trust, a family trust, which then deeded the ways to James R. Julian and Donald D. Cattanch before the trust was terminated.[24]  The deed conveyed to the trust the fee in numerous named ways, and also conveyed the entire fee in all remaining unnamed ways in Case No. 647, with the specific exception of the six ways leading between waterfront lots to the beach shown on Plans B, D, and F.[25]  Even after the subdivision was complete and the other ways had been conveyed expressly to their family trust, Luscombe and Morley thus reserved for themselves, and presumably their heirs, the fee interest in the ways to the beach.

Starting in the 1970s, the deeds to later-conveyed lots contain an exclusive reservation of rights in the ways; they grant rights of access over the ways shown on a specific plan or

---

[24] The certificate of title to Julian and Cattanch lists encumbrances for the takings in Bayview Road, Shore Drive, and Common Landing, discussed supra.

[25] See Guideline 19 of the Land Court Guidelines on Registered Land, Easements, Restrictions, Covenants and Other Rights Granted or Reserved in Deed (2009).

all plans in the subdivision, and explicitly exclude a fee interest.  The plaintiffs argue that this is an indication that the developers did not intend to retain rights in fees in the ways in their conveyances of earlier lots, because they knew how to do so and would have done so.  This more precise language including the reservation of the fees in the documents beginning in the 1970s is better explained as reflecting a response to the derelict fee statute, which was first enacted in 1971.  See G. L. c. 185, § 58.  Although that statute does not apply to land registered prior to its enactment, and thus is not applicable to any of the lots at issue here, it does apply prospectively to registered land.

We are not persuaded by the plaintiffs' suggestion that the way simply ceased to exist after the conveyance of the fee to Aldrich and the Waldrons.  That argument would make a nullity of a carefully-drafted set of ways on a plan of residential lots, leading to the waterfront, with undeveloped land clearly indicated across the street from those lots.  Under this view, the way would exist only during the period when a single lot had been conveyed.  The second conveyance, on the other side of the way, would extinguish the easement in the way explicitly conveyed by Luscombe and Morley to Aldrich and the Waldrons.

Based on information available in documents on file with the land registration office in Case No. 647, the defendants

have rebutted the common-law presumption that Luscombe and Morley intended to convey title to the center line of the way; we conclude that the developers intended to convey, as set forth in the deeds and certificates of title, rights of access over the way to Aldrich and the Waldrons, shared with others. The documents show that Luscombe and Morley intended to retain the fee in that way and the other ways on the plans filed in Case No. 647, and acted consistently with that intent for over forty years.

b. Easement rights in the way. Even without a fee in the way, the plaintiffs, as easement holders, have an interest in preventing use of the way by those without rights of access. In addition, all of the defendants seek determinations that they are entitled to use of the way. We turn to consideration of what rights over the way, if any, are held by the defendants.[26]

---

[26] We note that the Land Court judge determined that certain defendants did not hold access rights over the way even where their lots appear on the G Plan, and notwithstanding her conclusion that Luscombe and Morley intended to convey access over the way to all owners of lots on the G Plan, because the defendants' certificates of title do not mention easement rights over any ways, or because the certificates describe their source of title with reference to a certificate for another lot appearing on the G Plan, without express mention of the G Plan. However, even on registered land, there is no requirement that easements appurtenant, benefiting a lot, must be listed on the certificate of title. See Duddy v. Mankewich, 75 Mass. App. Ct. 62, 64 n.6 (2009) (Duddy), quoting Dubinsky v. Cama, 261 Mass. 47, 56-57 (1927) ("'However desirable it may be that the . . . certificate of title should disclose the whole state of the title, including all easements appurtenant,' G. L. c. 185

One claiming the benefit of an easement bears the burden of proving the existence of that easement on the servient estate. Reagan v. Brissey, 446 Mass. 452, 458 (2006); Boudreau v. Coleman, 29 Mass. App. Ct. 621, 629 (1990).  Where recorded land is at issue, it is well established that easements to ways shown on a plan may be recognized based on references to that plan in a deed.  A plan referred to in a deed becomes a part of the contract so far as may be necessary to aid in the identification of the lots and to determine the rights intended to be conveyed. Boston Water Power Co. v. Boston, 127 Mass. 374, 376 (1879). "'In determining the intent, the entire situation at the time the deeds were given must be considered." Goldstein, supra at 755, quoting Prentiss v. Gloucester, 236 Mass. 36, 52 (1920). For land abutting a way, where the deed describes the way as a boundary and references a plan showing the way, the grantor's intent to convey an easement over the way is assumed.  "[A]

_____

requires only easements to which the registered land is subject be set out in the certificate of title.  Easements [benefiting] the property need not be noted").  Accordingly, the absence of any notice on the certificates of certain defendants benefiting their land is without consequence to the analysis here.  A reasonable purchaser would have discerned the developers' intent with regard to all lots on the G Plan.  See Duddy, supra at 64, 67, 68, 69-70 (concluding all of plaintiffs' lots had right of access over way, and were burdened by others' rights of access, where some plaintiffs' deeds and certificates were silent concerning easement rights, some plaintiffs' deeds contained grants of access to individual lot owner, and other plaintiffs' certificates noted easement rights only for benefit of that plaintiff's lot).

right of way shown on a plan becomes 'appurtenant to the premises conveyed as clearly as if mentioned in the deed.'" Duddy, supra at 67, quoting Lagorio v. Lewenberg, 226 Mass. 464, 466 (1917). Easements to which a registered parcel is subject, however, are another matter entirely, and the fundamental issue in this case.

i. Land registration act. The purpose of the land registration act is to ensure that holders of land registered under the act enjoy certainty of title to their property. See Commonwealth Elec. Co. v. MacCardell, 450 Mass. 48, 50 (2007); Doyle v. Commonwealth, 444 Mass. 686, 690 (2005); G. L. c. 185, § 57. Every judgment of registration "shall set forth the estate of the owner and . . . all particular estates, mortgages, easements, liens, attachments and other encumbrances . . . to which the land or the owner's estate is subject." G. L. c. 185, § 47. "[E]very plaintiff receiving a certificate of title in pursuance of a judgment of registration, and every subsequent purchaser of registered land taking a certificate of title for value and in good faith, shall hold the same free from all encumbrances except those noted on the certificate, and any of the [statutorily enumerated] encumbrances which may be existing . . . ." G. L. c. 185, § 46.

Thus, for registered land to be burdened by an easement, generally the easement must be shown on the certificate of

title.  Commonwealth Electric Co. v. MacCardell, 450 Mass. at 50-51.  See Jackson, supra at 711; Tetrault v. Bruscoe, 398 Mass. 454, 461 (1986); Goldstein, supra at 757; Dubinsky v. Cama, 261 Mass. 47, 56-57 (1927).  In addition, "[n]o title to registered land, or easement or other right therein, in derogation of the title of the registered owner, shall be acquired by prescription or adverse possession.  Nor shall a right of way by necessity be implied under a conveyance of registered land."  G. L. c. 185, § 53.

Nonetheless, with certain limited but important distinctions, such as those just noted, registered land is to be treated in the same manner, and according to the same legal doctrines, that apply to recorded land.  See G. L. c. 185, § 77 (land registration act shall not "change or affect in any way any other rights or liabilities created by law and applicable to unregistered land, except as expressly provided in this chapter").  See, e.g., Goldstein, supra at 755 ("the same principles that govern the effect to be given a plan in the case of unregistered land apply where the land is registered"); Williams Bros. Inc. of Marshfield v. Peck, 81 Mass. App. Ct. 682, 686 (2012) (registration act only changes common law if intent to do so is clearly expressed).

ii.  First Jackson exception.  In Jackson,[27] as here, the issue concerned access rights to a beach over a way between two waterfront properties in a subdivision comprised of registered land.  Jackson, 418 Mass. at 705.  The certificates of title to the waterfront lots did not expressly mention an easement over the way in question for the benefit of the inland lot owners.  Id. at 706.  After conducting an examination of other documents in the land registration office to determine "whether an express easement exists as a result of the references on the [waterfront lot owners'] certificates of title to the [w]ay and to plans showing the [w]ay," id. at 709, we determined that the plans were referenced in the certificates "principally to provide a description of the boundaries of the properties," and the way at issue was "only generally referenced as marking a boundary."  Id. at 710.  Accordingly, we concluded that no express easement existed.  Id. at 714.

We recognized, however, that there are two exceptions to the general rule that an easement burdening registered land must be set forth explicitly on the certificate of title.  Under the first Jackson exception, "an owner, in limited situations, might take his property subject to an easement at the time of

---

[27] The plaintiffs contend that Jackson itself is wrongly decided, and urge that we adopt a stringent interpretation of G. L. c. 185, §§ 46 and 47, that would eliminate both of the Jackson exceptions.  We decline this invitation.

purchase: (1) if there were facts described on his certificate of title which would prompt a reasonable purchaser to investigate further other certificates of title, documents, or plans in the registration system."[28] Id. at 711. We therefore proceeded to determine whether, even though the easement for the benefit of the inland lot owners was not expressly described on the certificate of title, "there were facts described on [the waterfront lot owners'] certificate[s] of title which would prompt a reasonable purchaser to investigate further other certificates of title, documents, or plans in the registration system." Id.

We explained that a reasonable purchaser of registered land whose certificate of title references a plan "would be expected to review that plan." Id. We stated further that where a parcel of registered land involves a lot bounded by a way, and the deed or certificate of title refers to a plan, a potential purchaser is on notice that the property is bounded by a way and that others may have easements in the way. Id. at 712. The purchaser would "be expected to examine the certificates of other lot owners in the subdivision to determine whether others might have an interest in the [w]ay." Id. Because such an

---

[28] The second Jackson exception applies where an owner takes possession of registered land with actual knowledge that an encumbrance exists. Jackson, supra at 711. None of the parties suggests that it has any application here.

examination is limited to documents on file in the land registration office, it is consistent with the purposes of the land registration act.

After examining additional documents in the land registration office, including approximately sixty deeds, and associated certificates and subdivision plans, we concluded that no easement existed because none of the documents referenced an easement or a right to use the way in question.  Id. at 708, 710.  We observed that

> "[a] review of the [inland lot owners'] certificates of title would disclose to [the waterfront lot owners] no right to use the [w]ay on any certificate.  Appurtenant to each of the [inland lot owners'] lots is a precisely described right to use only those private ways necessary for access to that specific lot.  Further, as the facts disclose, the record is devoid of any indication in other certificates of title, and in deeds, of any rights in the [w]ay.  On the contrary, all the documents consistently express rights only in private ways considered essential for access to the lot being conveyed."

Id. at 712.  We accordingly concluded that the grantors specifically intended to convey only limited easement rights over the particular listed ways necessary for the inland lot purchasers to reach their lots, and that the requirement of the first Jackson exception had not been satisfied.  Id. at 713.

iii.  Application of first Jackson exception to Luscombe and Morley's conveyances.  The plaintiffs maintain that, even if

Jackson and its progeny[29] were decided correctly, a reasonable

[29] More than twenty years after this court's decision in Jackson, and relying on the first Jackson exception, the Appeals Court held that a defendant lot owner had easement rights in a private way abutting the plaintiffs' registered lots, where the plaintiffs' certificates of title contained no explicit reference to an easement for the benefit of the defendant. Lane v. Zoning Bd. of Appeals of Falmouth, 65 Mass. App. Ct. 434, 437-438 (2006) (Lane). In that case, the plaintiffs' lots fronted along the private way, and one side of the defendant's lot abutted the terminus of the way. Id. at 435. The way extended approximately thirty feet inside the defendant's lot, then terminated. Id. at 436. One of the plaintiff's certificates stated that there was "appurtenant to said land a right of way . . . , said right to be exercised in common with all others now or hereafter lawfully entitled thereto." Id. at 438. The other plaintiffs' deed referenced the private way as a boundary, and both their deed and their certificate of title referred to a subdivision plan filed in the registration office of the Land Court. Id. The Appeals Court determined that this put the plaintiffs on notice that their property was bounded by a way over which others might enjoy a right of access. Id.

Three years later, again relying on the first Jackson exception, the Appeals Court determined that the plaintiffs' lots on registered land, all of which abutted a private road, were burdened by easements for access by the defendant lot owner, even though none of the certificates of title in the plaintiffs' chains of title showed an easement for the benefit of the defendant's lot. See Duddy, supra at 66-68, 70 n.13. Each of the plaintiffs' deeds described their land as being bounded by a private road, and referenced a subdivision plan showing that road. Id. at 68. Some of the plaintiffs' deeds included a right to access the road for their own use, and some plaintiffs' certificates of title included an easement for access by the lot owner; for other plaintiffs, neither their deeds nor their certificates mentioned easement rights. Id. at 64. None of the express easements for the plaintiffs' use of the road mentioned rights for anyone other than the lot owner. Id. at 64-65. The defendant's lot was created on a later plan, and abutted the terminus of the same private road, which was extended on the later plan into other land that had been owned by the developer. Id. at 63, 65. The court concluded that the defendant's lot was benefited by a right of access over the private road, because the road on the plan creating the

purchaser in the plaintiffs' positions would not have had reason
to review any documents indicating potential rights of access
over the way by any of the defendants.  The plaintiffs contend
that the D and F Plans do not include, reference, or incorporate
the defendants' lots.  The plaintiffs maintain that, based on
their certificates, no reasonable purchaser would have been led
to review any plans other than the D and F Plans, or any
certificates of title after the Aldrich and Waldron
certificates, and thus would not have become aware of any
documents indicating the existence of rights over the way other
than to the few waterfront lots shown on the D and F Plans.
Because, they contend, no reasonable purchaser would have had
notice of any possible encumbrance over the way, the Land Court
judge must have relied improperly on a theory of easement by
estoppel[30] in reaching her conclusion that any of the defendants

plaintiffs' lots was shown "as proceeding, open-ended, a
measurable distance into [the developer's] remaining land" which
would have required further inquiry.  Id. at 67-68.

[30] Because the Appeals Court indicated, in both Lane and
Duddy, that, in those circumstances, the court also would have
concluded that easement rights existed based on a theory of
estoppel, we touch briefly on the theory of estoppel in those
cases.  See Duddy, supra at 70, n.13; Lane, supra at 438-439.
With regard to recorded land, "'when a grantor conveys land
bounded on a street or way, he and those claiming under him are
estopped to deny the existence of such street or way, and the
right thus acquired by the grantee (an easement of way) is not
only coextensive with the land conveyed, but embraces the entire
length of the way, as it is then laid out or clearly indicated
and prescribed.'  Casella v. Sneierson, 325 Mass. 85, 89

[(1949)], and cases cited.  This rule is applicable even if the way is not yet in existence, so long as it is contemplated and sufficiently designated."  Murphy v. Mart Realty of Brockton, Inc., 348 Mass. 675, 677-678 (1965) (Murphy).  In Lane, supra at 437, the Appeals Court observed that "undisputed facts" -- the plaintiffs' and defendants' deeds and plans, on file in the land registration office -- themselves "established" that the defendant lot holder had an easement for access over a way abutting the plaintiffs' lots.  The court noted that its conclusion was "not affected by the fact that the plaintiffs' titles . . . are registered."  Id. at 437.  "[T]he estoppel giving rise to such an easement occurs by virtue of the language in a deed of conveyance, which language refers to the way as a boundary."  Id. at 439, citing Adams v. Planning Bd. of Westwood, 64 Mass. App. Ct. 383, 392 (2005).

It is true that in Jackson, supra at 714 n.7, when discussing Goldstein v. Beal, 317 Mass. 750, 755-756 (1945) (Goldstein), we noted that "Goldstein explicitly disclaims an estoppel theory."  This, however, is a description of the holding in Goldstein, which focused on the intent of the parties.  It is not a statement that no easement by estoppel on registered land could ever arise.  Indeed, in Goldstein, we observed that, "in other circumstances a reference to a plan in a deed on which a passageway is designated may be sufficient to create rights in it."  Id. at 756, and cases cited.

That being said, we discern no reason why, in principle, in such limited circumstances as in Lane and Duddy, application of an estoppel theory to subsequent purchasers would impede the purposes of the land registration scheme.  In each instance, a seller conveyed registered land abutting a way, the conveyance described the ways as a boundary, and the deed referenced a subdivision plan on file in the land registration office showing the way.  See Duddy, supra at 63-64; Lane, supra at 435, 438.  In such circumstances, the deeds and plan necessary to establish an easement by estoppel are all documents within the land registration system and also make the showing necessary to establish the first Jackson exception.  We note also that the Land Court's own guidelines on registered land, setting forth rules of construction of deeds, state, "Reference to another instrument or plan incorporates that document into the description in its entirety."  Guideline 2.1.4.2.2(c) of the Land Court Guidelines on Registered Land (2009).  We make no statement, however, concerning other, broader uses of the term "estoppel" to include ways other than those abutting the land at

hold access rights over the way.

We do not agree that a reasonable purchaser would have so limited the examination.  Purchasers are expected to review the plan showing the lot in question, and to investigate further other certificates of title, documents, and plans contained within the registration system, at the time of their purchase, to determine both their own rights and whether others have rights.  See Jackson, supra at 711-712; Duddy, supra at 62.

The judge stated that, under the first Jackson exception, a purchaser of registered land is required to investigate other documents within the land registration system; at the time of the plaintiffs' purchases, in 1994 and 1999, the plaintiffs would have been bound to investigate the F and D plans referenced explicitly on their certificates; a review of those plans would have demonstrated the "progression of the development" and would have required them to review the deeds and certificates underlying the lots contained on the plans showing the way; and a review of the defendants' certificates that reference plans showing the way would have informed the plaintiffs that the grantors intended to convey easement rights to those lot owners, even though the easements are not noted on

---

issue, conveyed by a deed referencing a plan showing those ways. See Rahilly v. Addison, 350 Mass. 660, 662 (1966); Casella v. Sneierson, 325 Mass. 85, 89 (1949).  See also Jackson, supra at 711, quoting Pearson v. Allen, 151 Mass. 79, 81 (1890).

the plaintiffs' certificates.  We agree.  This is precisely the analysis undertaken in Jackson, and an examination of the documents in the land registration office supports the judge's conclusion.

The Hickey certificate describes their lot as "Lot X on Plan 647-F," and the Paglia certificate describes their lot as Lot J on Plan 647-D.  Both the Aldrich and Waldron deeds grant access to all "ways" on their respective plans, and, in the Waldron deed, specifically to ways adjacent to lot X.  Both deeds state that they are bounded by ways on two sides (one being the way at issue).  Upon a review of the D and F Plans, a reasonable purchaser of the plaintiffs' lots would have been informed of the existence of the way, connecting to another, open-ended, "road," now known as Shore Drive.  On the D Plan, Shore Drive extends into adjacent land referenced as appearing on the G Plan.  On the F Plan, Shore Drive extends into land referenced as appearing on the D Plan.

A review of the F plan would disclose two other ways to the water, between two other sets of lots, virtually identical to the way between lots J and X.  Viewed together, the three ways show a pattern of evenly spaced ways to the water every three or four lots, on this small strip of beachfront lots.  The D and F plans also show the undeveloped land on the inland side of Shore Drive across from Lots J and X, also owned by developers

Luscombe and Morley. In addition, there is a road abutting Lot F on the eastern side of the D Plan, and then running south from Shore Drive, along Luscombe and Morley's undeveloped land, to a "town road" parallel to Shore Drive, on the southern edge of the D Plan. The north-south road is too long to show in full on the D Plan, so a break in the road is indicated, in order to display the "town road" on the same page. The "town road" is then shown leading, open-ended, west into the middle of Luscombe and Morley's undeveloped land. This clearly indicates the intent to develop all of Luscombe and Morley's undeveloped land inland from Shore Drive to the town road. Thus, even from an examination of these two small plans, the network of interconnecting ways, and the planned development of other inland lots that would make use of the ways, would have been immediately apparent.

In addition to the layout of the ways, notations on the plans would suggest to a reasonable purchaser that other documents in the land registration system might show that others had easement rights over the way. The D and F Plans are both titled "Subdivision of Part of Land shown on Plan 647A, Filed with Cert. of Title No. 16." A notation on each plan states that it is a "copy of part of plan" filed in the land registration office. On its eastern edge, the D Plan specifically references the G Plan. The G Plan includes open-

ended ways leading into other land of Luscombe and Morley, designated as being part of Certificate No. 3710, that is now the M Plan. These references, in addition to the references to the developers' Certificate No. 3710, which is included in the Aldrich and Waldron certificates[31] (and in the Paglia and Hickey certificates), would have informed a potential purchaser of the extent of the developers' land, and of the set of potentially benefited lots.[32]

A reasonable purchaser, even at the time of the Aldrich conveyance, thus would have been aware of the progression of development along the waterfront, and the later progression inland. This should have alerted a purchaser that there might have been others who could have rights, similar to his own rights, over the way adjacent to his lot. We conclude that these are "facts described on [the] certificate of title which would prompt a reasonable purchaser to investigate further other

---

[31] Even at the time of the Aldrich conveyance, when the D Plan was created, the B Plan, referenced in Certificate No. 3710, showed a similar scheme. See note 5, supra.

[32] As noted, supra, the Aldrich and Waldron certificates both state that the land "is subject to and has the benefit of the rights and provisions in [Certificate No. 3710], so far as the same are in force and applicable." Among other things, Certificate No. 3710 states that its land is "subject to and has the benefit of all outstanding rights of way, if any such there be . . ." Certificate No. 3710 contains a list of other lots, beyond those few waterfront lots shown on the bay side of Shore Drive on the D and F Plans; it lists all first deeds out from Luscombe and Morley for the entire 217 acre parcel.

certificates of title, documents, or plans in the registration system," Jackson, supra at 711, including the G and M Plans that contain lots inland from Shore Drive and reference each other.[33]

Based on the above, we conclude that the judge was correct in holding that Luscombe and Morley intended to grant access over the way to all of the lots on the G Plan, and that the defendants in the first and second groups hold access rights over the way.  See Adams v. Planning Bd. of Westwood, 64 Mass. App. Ct. 383, 389 (2005); Boudreau v. Coleman, 29 Mass. App. Ct. 621, 629, (1990).  See, e.g., Reagan v. Brissey, 446 Mass. 452, 461 (2006) (implied easement rights in parks benefitting lot owners in a subdivision); Leahy v. Graveline, 82 Mass. App. Ct. 144, 148-149 (2012) (beach rights in back lot owners based on deeds, plans, and contemporaneous advertisements).

The judge concluded that the remaining lot owners, largely the owners in the third group whose certificates contain references to the M Plan or derivative portions of that plan, do not have easement rights in the way because the plans referenced

_____

[33] The plaintiffs argue that a reasonable purchaser should look no further than the first deed out from the common developer to his predecessor in interest; if that certificate shows no reservation of an easement, no other documents need be examined.  But that is not the case.  When conducting an investigation of the registration system, "we ask whether there were facts . . . available [to the plaintiffs] at the time of their purchases, that would lead them to discover that their propert[ies] were subject to an encumbrance, even if that encumbrance was not listed on their certificates of title" (emphasis added).  Jackson, supra at 711.

on their certificates do not show the way and they were not granted rights over all ways in Case No. 647. Based on the clear intent of the original developers, as indicated in the interrelationship of the subdivision plans, the pattern of conveyance, the deeds and certificates of title expressly granting access to all ways in the Land Court case or to all ways on a plan, we conclude that the owners in the third group, and most of the unclassified owners, see notes 4 and 26, supra, also hold easement rights over the way.

We note first that the judge had before her three "sheets," labeled 674M sheets 1, 2, and 3, each showing portions of the new lots created on the M Plan. These sheets were stipulated to by the parties as being copies of documents filed in the Barnstable Registry District. Although the sheets explicitly reference the G Plan, they do not show the way itself. An examination of the M Plan on file in the land registration office,[34] however, shows portions of the D, F, and G Plans in the

_____

[34] The M Plan on file with the land registration office is the plan approved by the Land Court in allowing the subdivision, see G. L. c. 185, §§ 1, 10, 26-31, 33, 51, 117, of which this court may take judicial notice. See Land Court Manual of Instructions for the Survey of Lands and Preparation of Plans § 4.1 (2006). See, e.g., id. at §§ 1.1, 1.2, 1.3, 1.5, 2.1.2.1, 2.1.2.2. See also Guideline 5 of the Land Court Guidelines on Registered Land, Approval by the Engineering Department (2009).

In Duddy, supra at 69 n.12, the Appeals Court suggested, but did not decide, that for purposes of the documents a reasonable purchaser should examine, the original grantees would

northeastern quadrant of the M Plan. The M Plan includes an open-ended portion of the way, as well as an open-ended portion of the neighboring way to the water between waterfront lots N and O. The M Plan also contains an outline of the area of the G Plan, to the north of the new lots shown on sheets 1, 2, and 3. The southernmost set of lots created on the G Plan are indicated on the M Plan as open-sided to the north, just as the lots on the D and F Plans are indicated as open-sided lots on the G Plan. Thus, the M Plan, filed by Luscombe and Morley in the land registration office in June, 1947, seven years after the filing of the G Plan, clearly establishes their intent to treat the M Plan and the G Plan as an interrelated whole, with ways leading into Shore Drive and into the ways to the waterfront.[35]

---

be chargeable with notice of documents filed in the Land Court registration office in Boston, not just those in the Barnstable Registry District. The court noted that the "registration system," as defined in the registration act, encompasses documents on file in the Land Court, and imputing such notice would not impose an undue burden on purchasers of registered land. Id.

[35] In Rahilly v. Addison, 350 Mass. 660, 662-663 (1966), a case involving a petition for registration of a waterfront lot, we determined that the defendant inland lot owners held an easement for access to a beach over a private way abutting the plaintiffs' waterfront lot, where neither the plaintiffs' nor the defendants' deeds from a common grantor mentioned an easement over the way. Both the plaintiffs' and the defendants' deeds, however, contained easement rights to a road paralleling the water, which intersected with the private way, as well as another road, perpendicular to the shore road, that crossed the

Moreover, simply applying the same rationale as the judge used in concluding that defendants with certificates referencing all ways on the G Plan have access rights over the way (which appeared on the G Plan), all of the defendants whose certificates reference access rights over the ways on the M Plan, where the way also appears, have access rights over the way.

This intent also can be ascertained by examining only the three M Plan sheets provided to the judge, which, while showing the new lots, do not include as much of the context showing the interrelated plans. Nonetheless, each sheet does show ties to

shore road and ended at a different section of the beach. Id. at 661-662. We determined the common grantor intended the inland lot owners to have access to and use of the beach area, and affirmed registration of the plaintiffs' land with the encumbrance noted for the inland lot owners' access over the private way. Id. at 662-664. The plaintiffs argued, as do the plaintiffs here, that their deed was conveyed out from the common grantor to their predecessor in title several years before the defendants' deeds were conveyed to the defendants' predecessors in title, and therefore that the grantor could not have intended an easement to benefit any of the defendants. Id. at 663. We concluded that the judge was warranted in finding a common scheme to benefit all of the lots in the subdivision with beach access and use of the beach. Id. at 662-663. "The existence of . . . a building scheme . . . [may] show an intention that the restrictions imposed upon the several lots shall be appurtenant to every other lot in the tract included in the scheme." Id., quoting Snow v. Van Dam, 291 Mass. 477, 481 (1935).

This is not contrary to our observation in Jackson, supra at 711-712, that a reference to a plan laying out a large tract would not itself provide each purchaser of a lot on that plan with a right of way over every road and way laid down. As noted there, intent is paramount.

some portion of the D, F, and G Plans, and ways connecting those plans. The facts here, and the relationship of the ways on the G Plan and the M Plan, are similar, in certain pertinent respects, to the circumstances in Duddy, supra at 62-65. There, the plaintiffs owned registered lots created on one plan, fronting on a private road that provided access to a public way. Id. at 63-64. The defendant owned a lot on a later-created plan which abutted a later-created portion of that way. Id. at 63, 65. On the plan creating the plaintiffs' lots, the way was shown as open-ended and extending into other land owned by the developer of the subdivision. Id. at 68. Some of the plaintiffs' certificates of title, and some of their deeds, included an express easement granting the plaintiff lot owner a right of access over the private road leading to the public way, and some did not; others were silent as to any easement over the private road. Id. at 64. None of the easements in any of the plaintiffs' deeds or certificates mentioned rights over the road for the benefit of anyone other than the plaintiff lot holder. Id. at 64-65. Nor did any of the certificates or deeds indicate that the developer reserved rights in the private road at the time he conveyed the lots on the first plan, that he might later use to convey easements to as-yet-undeveloped lots on some future plan. Id. at 65. In addition, at the time of the litigation, the private road existed on the ground only as far

as indicated on the first plan, which did not show the defendant's lot.  Id.

In concluding nonetheless that the defendant had access rights over the private road abutting the plaintiffs' lots, the Appeals Court stated that a review of the first plan "would also have put these plaintiffs on notice that [the road] continued onto [the developer's] remaining land," id. at 68, which he later subdivided in the second plan.  Id. at 68-70 & n.13. Here, similarly, Luscombe and Morley clearly intended that the lot holders on the M Plan, like the other lot holders on the G Plan, have access rights over the way.

In addition to determining that there were no easements over the way for the benefit of the lots created on the M Plan, the judge concluded also that most of the defendants who own lots created on the later derivative plans do not hold access rights over the way.  We do not agree.  These derivative plans show small sections of lots on streets that already existed on the G or M Plans.  The plans simply reconfigure certain lots along an existing way.  Each plan shows open-ended ways leading off the edges (into the continuation of that road on the G or M Plan), and some also show open-ended partial lots, established on the G or M Plans, on their boundaries.  Plans 647-2, 647-8, 647-11, 647-13, 647-15, 647-S, and 647-W, in particular, show open-ended portions of Shore Drive.  Moreover, the titles of

these plans include references stating that they reconfigure specific noted lots on earlier plans.  Under the reasoning applicable to the defendants holding lots on the G and M Plans, we conclude that the owners of lots on these plans hold easements for access over the way.

3.  <u>Conclusion</u>.  So much of the judgment of the Land Court declaring that the defendants in the first and second groups have a right of access over the twenty foot way that runs between the plaintiffs' lots from Shore Drive to Cape Cod Bay is affirmed.  As to the defendants in the third group, and several of those who were not classified into any group, the decision that they do not hold easements for use of the way is erroneous. The case is remanded for entry of an amended judgment declaring that the holders of certificates of title nos. 95145, 408557, 144428, 70287, 77871, 178757, 190559, 190691, 110223, 164891, and 179868 also have the benefit of right of access over the way.

The remaining portions of the judgment are affirmed.

<u>So ordered</u>.

## Appendix.



Land Court No. 647